O.N.E. SHIPPING LTD.,
Plaintiff-Appellant,

v.

FLOTA MERCANTE GRANCOLOMBIA-
NA, S.A., Andino Chemical Shipping,
Inc., and Maritima Transligra, S.A., De-
fendants-Appellees.

No. 866, Docket 86–7988.

United States Court of Appeals,
Second Circuit.

Argued Feb. 26, 1987.

Decided Oct. 1, 1987.

Evelyn Cohn, New York City (Caspar F. Ewig, Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, of counsel), for plaintiff-appellant O.N.E. Shipping.

Edward M. Spiro, New York City (Catherine L. Redlich, Kostelanetz & Ritholz, New York City, Douglas E. Rosenthal, Arthur T. Downey, Sutherland, Asbill & Brennan, Washington, D.C., of counsel), for defendant-appellee Flota Mercante Grancolombiana.

Edward Schmeltzer, Washington, D.C. (Schmeltzer, Aptaker & Sheppard, Washington, D.C., of counsel), filed brief for defendants-appellees Andino Chemical Shipping and Maritima Transligra.

Before KAUFMAN and CARDAMONE, Circuit Judges, and POLLACK, District Judge.*

* Hon. Milton Pollack, Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

MILTON POLLACK, Senior District Judge:

This appeal invokes the judicially created act of state doctrine on the anti-competitive effect of a foreign sovereign's cargo reservation laws—the laws of the Republic of Colombia—which require that 50% of licensed imports of liquid bulk cargo ("LBC") be transported on Colombian owned vessels, or on vessels chartered by a Colombian company.

The district court dismissed this suit brought under the Sherman Antitrust Act, 15 U.S.C. Sections 1, 2 (1982), on the ground that a federal court should not exercise jurisdiction hereof because "Colombian interests outweigh whatever antitrust enforcement interests the United States may have in this case as a matter of law." We affirm the dismissal.

Following the dismissal, appellant filed a motion under Rules 59 and 60 of the Federal Rules of Civil Procedure for reconsideration of the court's findings in light of allegedly new evidence and for an amendment of the judgment to reflect the disposition of its motion for a partial summary judgment. The court rejected the motions and sanctioned the appellant $500 under Rule 11. We reverse the order for sanctions.

## BACKGROUND

In the late 1960s, Colombia passed a series of "Cargo Reservation Laws." The purpose of these laws was to favor Colombian shipping companies and the Colombian economy by requiring that imports and exports of certain types of cargo be transported exclusively by Colombian carriers. After 1969, those laws required that the first 50% of each licensed shipment imported into Colombia on trade routes served by Colombian carriers be transported on Colombian-owned vessels or on vessels chartered by a Colombian company. As the result of a delicate compromise between the United States and Colombia, U.S. flag lines were not subject to the protection laws.

Appellant O.N.E. Shipping Ltd. ("O.N.E."), a Bermuda corporation, and its predecessor in interest, Overseas Liquid Gas, Inc., a U.S. corporation, had offered regular liquid bulk cargo tanker service from U.S. gulf ports to Central and South America. Before 1973 there were no Colombian vessels capable of carrying LBC, so shipping to Colombia of this product was unaffected by the Colombia cargo reservation laws. This situation changed in 1973 and thereafter.

Appellee Flota Mercante Grancolombiana, S.A. ("Flota"), a Colombia shipping line substantially owned by the National Federation of Coffee Growers of Colombia, is a public organization and is "an agency or instrumentality" of the Colombian Government within the meaning of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. Section 1603(b).[1] Flota is Colombia's national line. Flota had no specially equipped LBC tankers of its own.

In 1973, to accommodate the needs of Colombian importers, Flota entered into a chartering agreement (revised in 1976) with appellee Andino Chemical Shipping, Inc., a Panamanian corporation and carrier of LBC, to handle Colombia's Atlantic coast trade.

In 1976, Flota entered into a similar chartering agreement with appellee Maritima Transligra, S.A. ("Transligra"), an Ecuadoran corporation, to charter the latter's tankers for use in Colombia's Pacific coast trade.

As required by Colombian law, Flota's chartering agreements were filed with and approved by the Colombian Government, enabling the non-Colombian tankers to receive the preferences accorded to Colombian flag vessels under the cargo reservation laws.[2] Together, the three appellees have captured up to 89% of the shipping imports

---

1. By law, profits from Flota's operations are used to promote industrial development and to build warehouses, roads, schools, hospitals, and power and telephone facilities.

2. Authorization of the agreements was granted by the Director General of Maritime and Port Matters—a rear admiral in the Colombian Navy and an official within the Ministry of National Defense.

of LBC into Colombia and O.N.E. has been virtually shut out therefrom.

As mentioned above, following a bilateral negotiation, no restrictions were placed by Colombia on the carriage of products imported from the United States if carried on United States flag vessels.

In April 1977, Flota, Andino and Transligra sought approval of their chartering agreements from the United States Federal Maritime Commission ("FMC") which would provide an exemption from U.S. antitrust laws. The FMC conditionally disapproved the agreements and subsequently conducted an investigation and a hearing. On May 23, 1983, the Administrative Law Judge ("ALJ") also disapproved the agreements. The ALJ found that Flota had attained near monopoly control over the LBC service to Colombia and that the agreements were prospectively unlawful. On appeal, the FMC affirmed the ALJ's order of disapproval and ruled that the agreements were anticompetitive, detrimental to United States commerce, contrary to the public interest and artificially increased transportation rates. The FMC ordered appellees to cease and desist. With these rulings in hand O.N.E. brought this antitrust action in the district court below.

O.N.E. charges appellees with unlawful concerted refusal to deal, conspiracy to exclude competitors, unlawful exclusive dealing, conspiracy to fix prices, conspiracy to divide markets and allocate customers, and attempt and conspiracy to monopolize.

## DISCUSSION

O.N.E.'s antitrust suit represents a direct challenge to Colombia's cargo reservation laws and to the legality of appellees' space chartering agreements under those laws. The laws were designed to promote the development of a strong Colombian merchant marine and to assist Colombia's economic development.

Among other purposes, the cargo reservation laws enable the Colombian Government to monitor the allocation of the resources of Colombian shipping companies, to determine whether particular trade routes could prove harmful to the country's economy and to consider whether an applicant would provide effective, regular and continuous service.

The Colombian Government has repeatedly made known to the United States Department of State, as well as to the Federal Maritime Commission, its strong support for the cargo reservation laws and the chartering agreements thereunder among the appellees.

Applying the balancing tests of *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597 (9th Cir.1976) and *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287 (3d Cir.1979) the district court concluded that because of Colombia's strong interest in its protectionist legislation and because of the Colombian government's ownership interest in Flota through the National Federation of Coffee Growers, there would be probable adverse effects upon our foreign relations were it to assert jurisdiction over this suit. The comity balancing test has been explicitly used in this Court. *See Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance et D'Armament*, 451 F.2d 727 (2d Cir.1971) (per curiam), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972).[3]

In an effort to provide a single standard to determine whether American antitrust laws apply to a given extraterritorial transaction, Congress enacted the Foreign Trade Antitrust Improvements Act of 1982, Pub. L. No. 97–290, 96 Stat. 1246 (codified at 15 U.S.C. Section 6a) [hereinafter referred to as the "Act"].

**3.** A well-known definition of comity was enunciated by the Supreme Court:

"Comity," in the legal sense, is neither a matter of absolute obligation on the one hand, nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).

Given the dismissal on comity grounds, the district judge did not decide whether the complaint should be dismissed under the "Act", although he did state that the Act "would not appear to provide a basis for refusing to exercise jurisdiction over this action."

Congress left it to the courts to decide when to employ notions of abstention from exercising jurisdiction in extraterritorial antitrust cases. Ninety years ago, the United States Supreme Court enunciated the American version of the act of state doctrine as follows:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897).

In the landmark case of *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court analyzed the significant policy considerations and "constitutional underpinnings" of the doctrine, noting that no case subsequent to *Underhill* had manifested any retreat therefrom. 376 U.S. at 416, 421–23, 84 S.Ct. at 934, 936–37. In addition to *Sabbatino* and *Underhill*, see *Oetjen v. Central Leather Co.*, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), and *Ricaud v. American Metal Co.*, 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733 (1918).

■ In essence, the act of state doctrine is a principle of law designed primarily to avoid judicial inquiry into the acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations for the actions of the foreign government. Such an inquiry is foreclosed under the act of state doctrine, *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 73 (2d Cir.1977), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977); and this is true regardless of whether the foreign government is named as a party to the suit or whether the validity of its actions are directly challenged in the pleadings. *International Ass'n of Machinists v. OPEC*, 649 F.2d 1354, 1359 (9th Cir. 1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982).

Although the district court engaged in the broader analysis of the possible adverse effects upon foreign relations were jurisdiction to be asserted, the long established act of state doctrine calls upon courts to make a preliminary assessment, on the record before it, of "the likely impact on international relations that would result from judicial consideration of the sovereign's act." *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 520–21 (2d Cir.), *cert. dismissed*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). This Court has made it clear that this is a legitimate exercise of an Article III court, not to be controlled by the expressed view of the executive branch in a given case. As we stated in *Allied Bank*:

> This estimation may be guided but not controlled by the position, if any, articulated by the executive as to the applicability *vel non* of the doctrine to a particular set of facts. Whether to invoke the act of state doctrine is ultimately and always a judicial question.

*Id.* at 521 n. 2. *Cf. Republic of the Philippines v. Marcos*, 806 F.2d 344, 357–60 (2d Cir.1986).

O.N.E. contends that the cargo reservation laws were "implemented [by Colombia] under the manipulative guidance of Flota"; that "commercially determined carrier relationships" should not be replaced by "Colombian-government dictated relationships"; that its "challenge in this proceeding does not so much address Colombia's cargo reservation laws per se as it does appellees' manipulation of these laws"; and that Flota has "manipulate[d] the cargo reservation laws so as to carve out a monopoly for itself and exclude all competition."

O.N.E.'s allegations make clear that its antitrust suit is premised on contentions that it was harmed by acts and motivations

of a foreign sovereign which the district court would be called on to examine and pass judgment on. *See International Ass'n of Machinists v. OPEC*, 649 F.2d 1354, 1358–59 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982).

 When the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the foreign government, claims made under the antitrust laws are dismissed. *Hunt, supra; Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92, 108–12 (C.D.Cal. 1971), *aff'd*, 461 F.2d 1261 (9th Cir.), *cert. denied*, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed. 2d 221 (1972); *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 406–08 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). Furthermore, where as here the conduct of the appellees has been compelled by the foreign government they are entitled to assert the defense of foreign government compulsion and the act of state doctrine is applicable.[4]

 Colombia's interest in this action has not been confined to Flota itself; the liquid bulk cargo service of Flota, Andino and Transligra has been important to Colombia's economy, and the Colombian government has so represented.

O.N.E.'s "antitrust" claims reflect dissatisfaction with Colombia's cargo reservation laws, not with appellees' space chartering agreements. Congress, however, recognizing the particular sensitivity of such challenges to a foreign sovereign's shipping regulations, has provided a separate proceeding before the Federal Maritime Commission ("FMC") to resolve such disputes. O.N.E. itself recently instituted such a proceeding.

On May 29, 1986, O.N.E. filed a petition before the FMC under Section 19(1)(b) of the Merchant Marine Act of 1920, 46 U.S.C. Section 876(1)(b). In that proceeding, O.N. E. sought to have the FMC issue regulations under 46 CFR Part 585 to meet conditions allegedly unfavorable to shipping in the foreign trade of the United States.[5]

O.N.E.'s petition stated as follows:

The cargo preference laws of Colombia have severely damaged O.N.E.'s financial position to the point of desperation. O.N.E. hereby asks the Commission to act immediately under Section 19 of the Merchant Marine Act of 1920, without further delay and to avoid further irreparable harm to petitioner, to suspend the tariffs of and preferential agreements by and between all Colombian carriers in this trade and/or prohibit transport of any import/export of liquid bulk products to/from Colombia/United States of America.

These allegations and claims of harm are in essence the same as those pleaded in this action. Clearly, Colombia's cargo reservation laws are alleged to be at the core of that harm. O.N.E. brought a proceeding before the FMC to remedy this alleged injury, and the mechanism invoked is one intended to preserve harmonious relations among nations while giving the injured party a possible remedy. The relevant FMC regulations stress the resolution of dis-

---

4. The agreements in question were entered into by foreign parties, approved by the government of Colombia, and relate to commerce into Colombia.

 The two Supreme Court cases relied on by Judge Cardamone in his dissent, on the other hand, both related to alleged conspiracies entered into in the United States by United States citizens which sought to monopolize trade in the United States. *See United States v. Sisal Sales Corp.*, 274 U.S. 268, 276, 47 S.Ct. 592, 593, 71 L.Ed. 1042 (1927); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99, 704, 82 S.Ct. 1404, 1409–10, 1413, 8 L.Ed.2d 777 (1962).

Furthermore, the Court noted in *Continental Ore* that there was no indication of foreign government approval of the actions in question. 370 U.S. at 706, 82 S.Ct. at 1414.

5. 46 CFR 585.8 provides that:

 Upon the filing of a petition, or on its motion when there are indications that conditions unfavorable to shipping in the foreign trade of the United States may exist, the Commission will notify the Secretary of State that such conditions apparently exist, and may request [that the Secretary] seek resolution of the matter through diplomatic channels.

putes through diplomatic channels. In these circumstances, the district court was clearly correct in concluding that courts should avoid the unnecessary irritant of a private antitrust action.[6]

The dismissal of the complaint is affirmed.

## Rule 11 Sanctions

The district court imposed sanctions of $500 against appellant for bringing motions to set aside the judgment on the basis of "newly discovered evidence" and for an amendment of the judgment entered to reflect the disposition of its motion for a partial summary judgment. The district judge ruled:

"Plaintiff O.N.E. Shipping has requested reargument and reconsideration of my previous Memorandum and Order, dated May 22, 1986, dismissing its complaint. Reconsideration is granted, but upon reconsideration plaintiff's requests to set aside the judgment and to amend it to reflect the fact that plaintiff made a motion for partial summary judgment, and to decide that motion are denied."

Having entertained plaintiff's application for reargument on and reconsideration of the Order dismissing the complaint, there is no basis in this record for having imposed sanctions under Rule 11 on the notion that the application was frivolous, as contemplated for the imposition of sanctions.

In the circumstances, the grant of the applications made by the plaintiff was equivalent to a tacit acknowledgment that a basis existed for consideration by the court of the relief sought. Sanctions are not to be imposed for unsuccessful litigation of a cognizable claim. The failure of the court to delineate specific facts demonstrating improper use of the motion alone undermines the imposition of sanctions herein. *See Dow Chemical Pacific, Ltd. v.*

*Rascator Maritime S.A.,* 782 F.2d 329, 344 (2d Cir.1986).

The award of sanctions is reversed.

CARDAMONE, Circuit Judge; dissenting:

The question raised on this appeal is whether a federal court should exercise anti-trust jurisdiction over conduct that, aided by foreign protectionist legislation, brings about unlawful consequences in the United States. The majority says "no". Respectfully, I disagree.

Applying the balancing tests of *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597 (9th Cir.1976) and *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir.1979), the district court concluded that because of Colombia's strong interest in its protectionist legislation and because of the Colombian government's ownership interest in Flota through the National Federation of Coffee Growers, there would be probable adverse effects upon our foreign relations were it to assert jurisdiction. Given its dismissal on comity grounds, the district judge did not decide whether O.N.E.'s complaint should be dismissed under the Foreign Trade Antitrust Improvements Act of 1982, Pub.L. No. 97–290, 96 Stat. 1246, 15 U.S.C. § 6a (1982) (Act), though it added, without discussion, that the Act did not appear to deprive it of jurisdiction. Relying on well-settled act of state doctrine principles, the majority affirmed the district court's dismissal on comity grounds. Because I do not believe that this case should be dismissed under the Act or on comity grounds, I dissent.

### A. *The Foreign Antitrust Improvements Act*

To understand Congress' purpose in this area, it is necessary to examine the 1982 Act. Section 402 of the statute provides that United States antitrust laws:

---

**6.** On July 17, 1987, O.N.E. withdrew its petition for relief under Section 19 of the Merchant Marine Act, 1920, then pending before the Federal Maritime Commission (FMC) and request-

ed that the Commission proceeding be discontinued. The FMC discontinued the proceeding without prejudice.

shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is nor trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; ...

15 U.S.C. § 6a (1982).

Under this statute Congress excluded from the coverage of U.S. antitrust laws conduct involving export commerce and purely foreign transactions unless such conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, import commerce or the export trade or commerce of a person "engaged in such trade or commerce in the United States." Congress aimed to clarify existing American law, and when defining the Act's scope used the phrase "commerce ... with foreign nations", which is precisely the same terminology as that used in § 1 of the Sherman Act. 15 U.S.C. § 1 (1982). In that context, the phrase has consistently been construed to cover international transportation cases. *See, e.g., Thomsen v. Cayser*, 243 U.S. 66, 88, 37 S.Ct. 353, 360, 61 L.Ed. 597 (1917); *United States v. Pacific & Arctic Ry. & Navig. Co.*, 228 U.S. 87, 105–06, 33 S.Ct. 443, 448, 57 L.Ed. 742 (1913); *Joseph Muller Corp.*, 451 F.2d at 729. Thus, the Act extends to international shipping of the sort involved here.

To say that the Act applies to foreign shipping cases is not to say that it is easily applied. For though shipping goods from the United States is clearly foreign commerce, it does not fall neatly into those categories set out in the Foreign Antitrust Improvements Act. O.N.E. argues that the Act does not deprive the courts of jurisdiction over this case because the conduct alleged falls under the exception for conduct having the required effect on "export trade or export commerce ... of a person engaged in such trade or commerce in the United States." 15 U.S.C. § 6a(1)(B). O.N.E. assumes that the service of transporting goods from the U.S. is itself "export commerce" and offers its various ties with the U.S.—for example, its U.S. parent and its U.S. derived income—as proof that it is a "person engaged in ... [export] commerce in the United States." Appellees counter that the transactions do not fall under (1)(B) because as a non-U.S. corporation O.N.E. lacks the indicia of a "person engaged in ... [export] commerce in the United States." Thus, appellees continue, the Act deprives the courts of jurisdiction over this case.

Both of these contentions are incorrect in several respects. First, the commerce involved here is import rather than export commerce; U.S. corporations import from foreign flag lines the service of shipping their goods from the United States to Colombia. *See Pacific Seafarers, Inc. v. Pacific Far East Lines*, 404 F.2d 804, 813 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969) ("[M]aritime nations ... providing transportation services ... are engaged ... in the 'export' of shipping services."). The conclusion that the transportation at issue here is "import" rather than "export" commerce is consistent with the Act's legislative history. The drafters of the Act had as their primary concern "preserv[ing]" antitrust protections in the domestic marketplace." H.R.Rep. No. 686, 97th Cong., 2d Sess. 10, *reprinted in* 1982 U.S. Code Cong. & Admin. News 2431, 2487, 2495 (House Report). The record amply demonstrates that a market exists among United States corporations for the service of shipping LBC to Latin America. Viewed as an import, the service of transporting goods from the U.S. is not excluded by the Act from the coverage of American antitrust laws. The Act explicitly states that it does not apply to "import trade or import commerce." 15 U.S.C. § 6a.

Second, even if the shipment of LBC from the United States is "export commerce", appellees' alleged conduct is still subject to U.S. antitrust laws because it falls under the Act's exception 1(B) for

conduct having a "direct, substantial, and reasonably foreseeable effect ... on export trade ... of a person engaged in such ... commerce in the United States." The legislative history defines "a person engaged in [export] trade or commerce in the United States" as a person "doing business in the United States." House Report, *supra*, at 10, 12, U.S.Code Cong. & Admin.News 1982, pp. 2495, 2497. Because Congress strongly emphasized that the Act was intended to preserve antitrust protection for the domestic market, *see* House Report, *supra*, at 9, 10, 11, U.S.Code Cong. & Admin.News 1982, pp. 2494–2496, and because O.N.E. participates in the domestic market for shipping services, it satisfies this "doing business" requirement.

Finally, federal courts have long taken jurisdiction over shipping services between the United States and abroad. *See, e.g., Thomsen*, 243 U.S. at 88, 37 S.Ct. at 360; *Pacific & Arctic Ry. & Navig. Co.*, 228 U.S. at 101, 33 S.Ct. at 446. Thus, the language of the Act and its legislative history makes it obvious that Congress did not aim to deprive federal courts of jurisdiction over suits like the instant one.

### B. *International Comity Considerations and Extraterritorial Antitrust Jurisdiction*

Yet, despite Congress' aim that there be jurisdiction, the majority holds that the case should be dismissed on international comity grounds because of Colombia's significant interest in implementing its cargo reservation law. The majority suggests that U.S. and Colombian interests should be weighed in order to determine whether jurisdiction exists over O.N.E.'s complaint. The Ninth Circuit in *Timberlane*, 549 F.2d 597, and the Third Circuit in *Mannington Mills*, 595 F.2d 1287, have each set forth a list of factors [1] to be considered in determining "whether the interests of, and links to, the United States ... are sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority." *Timberlane*, 549 F.2d at 613.

### 1. *The Scope of Extraterritorial Antitrust Jurisdiction*

Courts have often grappled with the precise standard to be employed in determining whether American antitrust law should apply to a particular extraterritorial transaction. As Judge Learned Hand wrote over 40 years ago in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945) (on certification from the Supreme Court), "[w]e should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States." *Id.* at 443. *Alcoa* established that in determining when Congress has chosen "to attach liability to the conduct outside the United States of persons not in allegiance

**1.** The factors enumerated in *Timberlane* are:
1. the degree of conflict with foreign law or policy,
2. the nationality or allegiance of the parties and the locations or principal places of business of corporations,
3. the extent to which enforcement by either state can be expected to achieve compliance,
4. the relative significance of effects on the United States as compared with those elsewhere,
5. the extent to which there is explicit purpose to harm or affect American commerce,
6. the foreseeability of such effect, and
7. the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.
549 F.2d at 614.
The ten factors listed in *Mannington Mills* are:
1. Degree of conflict with foreign law or policy;
2. Nationality of the parties;

3. Relative importance of the alleged violation of conduct here compared to that abroad;
4. Availability of a remedy abroad and the pendency of litigation there;
5. Existence of intent to harm or affect American commerce and its foreseeability;
6. Possible effect upon foreign relations if the court exercises jurisdiction and grants relief;
7. If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries;
8. Whether the court can make its order effective;
9. Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances;
10. Whether a treaty with the affected nations has addressed the issue.
595 F.2d at 1297–98.

to it," one must look to the effects upon U.S. commerce. *Id.* Since *Alcoa,* different formulations of the "effects" text have been advanced.

In an effort to provide a single standard to determine whether American antitrust laws apply to a given extraterritorial transaction, the Act of 1982 was passed. Congress deliberately refrained from adopting *Timberlane's* judicial balancing of the interests of the nations involved. The House Committee report, citing *Timberlane,* disclaimed any intent "to prevent [or] encourage additional judicial recognition of the special international characteristics of transactions." House Report at 13, U.S. Code Cong. & Admin.News 1982, p. 2498.

It was left to the courts to decide how to employ notions of international comity in extraterritorial antitrust cases. Using this grant of power, the majority concludes that jurisdiction should not be exercised on account of comity considerations and the probable adverse effect upon United States relations with the Republic of Colombia. The primary factor relied upon—Colombia's significant interest in its cargo reservation laws—seems to be insufficient to preclude jurisdiction under controlling Supreme Court precedents. Our highest Court has twice addressed the effect of United States antitrust laws on anticompetitive conduct allegedly aided by foreign protectionist legislation. In both cases it held that such assistance did not oust federal courts from jurisdiction on comity grounds.

## 2. Controlling Supreme Court Precedents

In *United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927), the defendants, Comision Exportadora de Yucatan, a public agency that purchased sisal from Mexican producers, and Sisal Sales Corp., its exclusive sales agent, had utilized the discriminatory legislation of the Yucatan to monopolize the importation and sale of sisal into the United States. The legislation imposed special taxes designed to drive other purchasers out of the sisal market, leaving Comision Exportadora as the sole sisal purchaser in the Yucatan. The Supreme Court, in finding jurisdiction over this conspiracy, observed: "True, the conspirators were aided by discriminating legislation, but by their own deliberate acts, here and elsewhere, they brought about forbidden results within the United States. They are within the jurisdiction of our courts and may be punished for offenses against our laws." *Id.* at 276, 47 S.Ct. at 594.

More recently, in *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the Supreme Court again found jurisdiction despite the role of another nation's discriminatory legislation in an alleged restraint of trade. In that case, one of the defendants, Electro Metallurgical Company of Canada (Electro Met), had been appointed by the Canadian government as the exclusive wartime purchasing agent for all of the vanadium required by Canadian industry. Plaintiff Continental Ore alleged that Electro Met, at the behest of its American parent, Union Carbide, used its position to exclude Continental Ore from the Canadian vanadium market. In finding jurisdiction, the Court relied on *Sisal Sales* stating that jurisdiction may be found "even though the defendants' control of ... production was aided by discriminatory legislation of the foreign country which established an official agency as the sole buyer of the product...." *Id.* at 705, 82 S.Ct. at 1414.

The Supreme Court went on to note that "[t]here is nothing to indicate that [Canadian] law in any way compelled discriminatory purchasing, and it is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Id.* at 707, 82 S.Ct. at 1414. It also stated that "there is no indication that ... any ... official within the structure of the Canadian Government approved or would have approved of joint efforts to monopolize the production and sale of vanadium or directed that purchases from Continental be stopped." *Id.* at 706, 82 S.Ct. at 1414.

### 3. Application of Supreme Court Precedents

The facts before us parallel those of *Sisal Sales* and *Continental*. In both cases, the alleged restraint of trade was possible only because of the discriminatory laws of a foreign sovereign. Also, in all three cases, one of the defendants—here Flota— was found to be an agent of that sovereign. In one respect, the instant case is even more conducive to an assertion of jurisdiction than either *Sisal Sales* or *Continental*. In those cases the governments ceded a greater degree of control over the commerce in question to the defendants, while in the instant case, in contrast, Flota and its associates were not singled out for special treatment, but received preferences along with all other Colombian flag lines. Further, only 50 percent of the trade involved was set aside in the case at bar while the entire vanadium trade was restricted in *Continental*. For these reasons, this case falls squarely within the holdings of *Continental* and *Sisal Sales* and should not be dismissed on comity grounds.

In one respect this case might arguably be distinguishable from *Continental*. In that case, as noted, the Supreme Court observed that there was no evidence that Canada had approved the effort to monopolize the vanadium trade. Here, the Colombian government has expressed approval in two ways which must be considered. Colombia initially approved the agreements creating the association among the appellees, and it sent telexes to the United States State Department urging it to intervene on the appellees' behalf before the FMC.

Neither action should cause a dismissal on account of comity. The approval of the agreements are not of the type contemplated by *Continental*. In *Continental*, the Canadian government clearly "approved" of the power defendants had in the vanadium market because it had granted them that power. But the government did not express its consent to their attempt to monopolize the market. Similarly, here the initial assent by the Colombian government may have given appellees a degree of power over LBC commerce, but there is no indication that in approving the agreements Colombia considered their antitrust implications.

Nor do the telexes compel a different conclusion. Although these telexes may demonstrate some sort of official blessing of the anticompetitive effects of appellees' conduct—since they were sent after U.S. corporations had filed objections with the FMC—they should not be considered when determining jurisdiction. As Kingman Brewster, the commentator who devised the doctrine of judicial comity balancing, observed: "reliance on case-specific foreign policy concerns would create problems of fairness and consistency.... Disparities in rulings would ... reward foreign governments that bellow at every threat of antitrust enforcement...." 1 J. Atwood & K. Brewster, *Antitrust and American Business Abroad* § 6.18, at 175–76 (2d ed. 1981). *Cf. United States v. The Watchmakers of Switzerland Information Center, Inc.*, 1963 Trade Cas. (CCH) ¶ 70,600, at 77,456–57 (S.D.N.Y.1962) (government approval of private activity does not deprive court of jurisdiction). Further, a consideration of these telexes in determining jurisdiction would unduly involve courts in foreign policy concerns. It is especially significant here that the United States State Department—despite a request to do so from the Colombian government—chose *not* to intervene on appellees' behalf before the FMC. Hence, the majority's notions of comity towards Colombia should not effectively reverse the settled holdings of the United States Supreme Court.

### C. Conclusion

In sum, despite the aid of foreign protectionist legislation, Flota and its associates' actions brought about unlawful consequences in the United States for which they should be answerable in federal court. Since the facts of the instant case fall plainly within controlling Supreme Court precedents, I must dissent from the majority's affirmance of the district court's dismissal of the complaint for want of jurisdiction on the grounds of comity and vote

instead to reverse and remand the case to the district court for further proceedings on the merits.