**FILETECH S.A.R.L. and Filetech U.S.A., Plaintiffs,**

v.

**FRANCE TELECOM and France Telecom, Inc., Defendants.**

No. 95 Civ. 1848 (CSH).

United States District Court, S.D. New York.

Sept. 15, 1997.

**466**

Ivan S. Fisher, Fisher & Soffer, New York City, for Plaintiffs.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This case presents the question whether a French corporation and its American subsidiary may invoke the antitrust laws of the United States in order to complain of the conduct of an entity of the Republic of France that occurred, and is occurring, almost entirely in France. The case is before the Court on defendants' motion to dismiss the complaint.

### I

Plaintiff Filetech S.A.R.L. ("Filetech") is a French corporation formed in 1988 by Guy Birenbaum, a resident of France and a citizen of France and Canada. In Filetech's words, its business purpose is "to create a data base which would include virtually every resident person, entity, or business in France, from which innovative marketing services could be created for a worldwide clientele." Complaint, ¶ 18.

Those "innovative marketing services" consist primarily of the direct mailing of unsolicited communications to French residents, businesses and entities, the mailers having purchased from Filetech that all-inclusive French data base that Filetech hopes to create.

Filetech formed its subsidiary, plaintiff Filetech U.S.A., Inc. ("Filetech U.S.A."), a New York corporation, to locate and contract with American businesses interested in direct mail marketing to potential customers in France. I will on occasion refer to the plaintiffs collectively as "Filetech."

Defendant France Telecom is an independent public legal entity created and wholly owned by the Republic of France. France Telecom owns and operates all fixed telephone services in France. Defendant France Telecom, Inc. ("Telecom Inc.") is a wholly-owned subsidiary of Telecom, with its principal place of business in New York. I will on occasion refer to the defendants collectively as "France Telecom."

### A

France Telecom engages in other commercial activities in addition to its fixed telephonic services business. One of these is the sale of access to its data base of telephone subscribers for the purpose of developing marketing lists. France Telecom engages in that business by means of two services known as "Marketis" and "Teladresses." I will describe them more fully infra. But it is first necessary to describe the genesis and purpose of a compilation, known as the "Orange List," that lies at the heart of this case.

The genesis and purpose of the Orange List may be traced to a series of French statutes and regulations. Article 7 of France Telecom's charter provides that when marketing the data contained in its directories, France Telecom "must comply with any legislative or governmental regulations protecting human identity, individual and civil rights and privacy."[1] There are a number of pertinent laws and regulations.

In 1978, the French legislature enacted the Data Processing and Individual Rights Law ("the Data Processing Act."). That act created a governmental agency called (in translation) the "Data Processing and Individual Rights National Commission,", and popularly known as the "CNIL," reflecting its French acronym. The CNIL regulates public and private data processing activities in France. Before conducting such activities, public entities like France Telecom and private entities

---

1. The following discussion of French laws, regulations, and their translations is based upon the declaration of Jacques Henrot, a French attorney, submitted with this motion.

like Filetech must apply to and receive from CNIL the requisite permission or acknowledgment. The Data Processing Act prohibits, *inter alia*, the gathering of data through fraudulent, unfair or illicit means, and empowers any individual to refuse, for legitimate reasons, the processing by computer of personal data about him. Persons processing personal data on a computer must ensure the security of the data and prevent it from being divulged to unauthorized third persons. Breach of the Act's provisions is punishable under the French Penal Code.

France Telecom's charter from the French government permits it, *inter alia*, to market its electronic telephone directory, accessible by computer, to third parties. In December 1990, the French legislature amended the Postal and Telecommunications Code ("the PTT Code") to allow the publishing of telephone subscribers or users lists, subject to the filing by publishers of telephone directories of an undertaking to comply with Article R. 10 of the PTT Code.

France Telecom itself operates under comparable restrictions. Article 7 of its charter provides that "France Telecom, when marketing the data contained in its directories, must comply with any legislative or governmental regulations protecting human identity, individual and civil rights and property . . ." That requirement implicates Article R. 10–1 of the PTT Code, which was amended in December 1990 to provide in pertinent part as follows:

> "All persons subscribing pursuant to the conditions set forth in Articles D.317 and D.284, may . . . request, without being liable to pay any fee, not to appear on the lists extracted from the telephone book and marketed by [France Telecom] . . . The use by anyone, of information extracted from the telephone book concerning persons mentioned in the previous paragraph, for commercial purposes or for public diffusion, is prohibited."

This law requires France Telecom to honor the wishes of subscribers who do not want their names to be revealed to anyone for marketing purposes. The record reveals that significant numbers of French residents hold that preference; a sentiment not unknown in the United States, where unsolicited direct marketing mailings frequently fill mailboxes to overflowing.

Obedient to Article R. 10–1 of the PTT Code, France Telecom maintains a list of French telephone subscribers who, prompted by a desire for privacy, have directed an Article R. 10–1 request to France Telecom. For reasons not revealed by the record, this is known as the "Orange List."

There is another color-coded French regulatory act upon which France Telecom relies. On May 12, 1992, the CNIL adopted Resolution No. 92–049 approving the "Saffron List." The Saffron List contains the names of France Telecom subscribers who do not wish to be bothered by advertisements sent by fax or telex. The CNIL stated in its resolution that:

> communicating the Saffron List would amount to making public a behavioral database devoted to persons hostile to commercial canvassing and could be detrimental to said persons. As such, the Saffron List can only be communicated indirectly, either via transmission of the entire list of telex/fax subscribers cleansed of the Saffron subscribers or by cleansing of those lists which will be communicated to France Telecom. (In translation; *see* Henrot Decl. at ¶ 17).

France Telecom says that this resolution of a French regulatory agency, although dealing with a different protected list, declares policy considerations that also resonate in the case at bar.

**B**

The effect of Article R. 10–1 as originally promulgated was to prohibit France Telecom from providing the names and addresses of subscribers included in the Orange List to any third party for any purpose. Another company, wishing to publish its own telephone directories, brought an action in the French courts invoking the antitrust rules contained in the European Union treaty. In February, 1994 the Court of Appeals of Paris decided *CMS v. France Telecom,* a case commenced by a non-party to the instant action which competed with France Telecom by

publishing telephone directories. In *CMS* the Court of Appeals of Paris held that notwithstanding Article R. 10–1 of the PTT Code, the European Union treaty antitrust rules embodied in the Treaty of Rome obligated France Telecom to make its entire non-cleansed directory of telephone subscribers (that is to say, including names and addresses contained on the Orange List) to competing independent publishers of telephone directories.

At the time of the briefing of the instant motion, an appeal from this decision was pending before the French Supreme Court of Appeal. In a judgment pronounced on May 6, 1996, the Supreme Court affirmed the holding of the Court of Appeals. The Supreme Court looked to the Treaty of Rome as establishing "the primacy of the principles of community law over national law," and, "without assessing the legality of article R. 10–1 of the [PTT]," concluded *inter alia* that "the Court of Appeal rightly ruled that the regulation could not hinder the free exercise of competition with respect to the publication of lists of subscribers by publishers of directories in competition with that published by the public company [France Telecom], which includes the names of persons appearing on the orange list." (Translation from the French text furnished by Filetech.)

While this appeal to the French Supreme Court was pending, the French government responded to the decision of the Court of Appeals of Paris in *CMS v. France Telecom* decision by modifying Article R. 10–1 of the PTT, effective May 6, 1994. The article's first paragraph reiterates the right of a telephone subscriber to request, without payment of fee, "not to be mentioned on the excerpts of the subscribers' lists marketed by [France Telecom]." The second paragraph of Article R. 10–1 as modified reads:

"It is forbidden for anyone to use for commercial purposes or to divulge to the public the personal data extracted from the subscribers' lists mentioned in the preceding paragraph. However such data may be used for the sole purpose of publishing lists of users mentioned at article R. 10."

France Telecom contends on this motion that the combined effect of the *CMS* decision and the 1994 modification of Article R. 10–1 of the PTT Code is to permit[2] France Telecom to communicate data containing the Orange List subscribers to third parties for the limited purpose of "publishing telephone directories." Main Brief at 14. But the Orange List data thus communicated "is communicated only embedded in the complete data base (that is, there in [sic] no separate communication of the Orange List as such)." *Id.* In France Telecom's view, under French law "[n]either France Telecom nor anyone else may use or communicate the Orange List or data in it for any other commercial purpose." *Id.* Those restrictions are said to arise from the modified version of Article R. 10–1, viewed in the larger context of the Data Processing Act, CNIL regulations, and the Penal Code.

In this regulated world, as it professes to perceive it, France Telecom says that it tries "to make its subscriber data base available to providers of marketing lists and at the same time comply in good faith with all of the above statutes and regulations." Main Brief at 15 (citing affidavits submitted by France Telecom in support of its motion). Under the procedure adopted to achieve that proclaimed goal, which France Telecom describes as "the fairest permissible approach," France Telecom "prepares a data base of its subscribers 'cleansed' of the Orange List, and it sells that 'cleansed' data base to all on equal terms (with a 15% discount for brokers) through the Marketis and Teladresses services." *Id.* France Telecom concludes, on a note of self-approval:

"By this method France Telecom avoids any prohibited use or communication of the names or persons or entities on the Orange List, and keeps their privacy sacrosanct. At the same time, France Telecom makes available to all who desire it, on

---

**2.** Perhaps the more accurate verb would be "require," given the antitrust rationale of the *CMS* decision. While France Telecom's main and reply briefs before this Court antedated the decision of the French Supreme Court described in

text, France Telecom presumably advances the same analysis, since the Supreme Court appears to have adopted the reasoning of the Court of Appeal of Paris in affirming that court's decision.

comparable commercial terms, the maximum amount of permitted information." *Id.*

### C

It is now necessary to describe France Telecom's Marketis and Teladresses services.

Marketis is a service accessible through a personal computer with a modem, or through the "Minitel," a small computer terminal made available to France Telecom customers on request. A France Telecom customer, using Marketis through a private computer or a Minitel, can create a marketing list on his own computer, and that list will be cleansed of names on the Orange List. A France Telecom officer expresses the view that generally, Marketis is suitable only for creating relatively small or specialized marketing lists. Rimbault Decl., ¶ 5.

Teladresses is a non-electronic service which enables a customer to order from France Telecom a list with specified desired characteristics. France Telecom generates the list (again, cleansed of Orange List names) and sends it to the customer with a bill for its services. The Teladresses service is suitable for generating lists of hundreds of thousands or millions of names. Rimbault Decl., ¶ 7.

Filetech does not share France Telecom's self-portrait of an entity trying in good faith to balance the interests of individual privacy and commercial competition.. In Filetech's view, France Telecom's protestation of concern for French citizens' privacy is hypocritical; its true motive is to profit from an anticompetitive control over the Orange List.

Filetech's discontent arises in this manner. Filetech wishes to obtain a French telephone directory cleansed of Orange List names to use in its dealings with customers in the direct marketing business. In order to copy France Telecom's electronic directory, Filetech accessed the directory through the Minitel method, previously described. The first three minutes of Minitel use are free; France Telecom charges for the service thereafter. To copy the entire France Telecom electronic directory and its periodic updates at minimum cost, Filetech has pro-

grammed a number of its computers to access Minitel, turn off after three minutes, and then re-engage the service. *See* Complaint, ¶¶ 31–32. That stratagem worked reasonably well, although Filetech adds in a plaintive footnote 2 to its complaint that while Filetech "is able to efficiently take advantage of the three minute threshold, the compilation of the entire data base and its updating, is still costly to it, since the time limit is often exceeded."

But Filetech's problem is that it cannot use the full directory, thus obtained, because that uncleansed directory contains names on the Orange List, with no way of identifying them. That circumstance destroys the utility of the directory for direct marketing purposes since, Filetech alleges in its complaint at ¶ 3, "[w]ithout the 'Orange List' no one can use the telephone directory as a data base source for creating marketing lists because that directory contains the names of people whom it is illegal to solicit." Filetech aptly analogizes the uncleansed directory to a mined field, with the Orange List constituting "the map setting out the location of those mines." *Id.* France Telecom does not have this marketing problem because it has the map.

Filetech alleges that in an effort "to level the playing field," Filetech has "repeatedly asked" France Telecom to either give it the Orange List, or sell to Filetech "from time to time at a competitive price" updated lists "of all the telephone subscribers from whom the Orange List people and entities have been deleted." Complaint, ¶ 4. France Telecom has refused these requests; it will only make cleansed lists available to Filetech (and to all others) through the Marketis and Teladresses services. Filetech alleges that France Telecom pursues that course "knowing full well that no competitor could possibly survive or exist if it has to acquire its data base at the cost of many millions of dollars." *Id.* Filetech alleges that France Telecom "is determined to drive [Filetech] out of business"; hence this action in an American district court, filed in March 1995, invoking the remedies of American antitrust law.

### D

Specifically, the Filetech interests charge France Telecom with monopolization in viola-

tion of section 2 of the Sherman Act, 15 U.S.C. § 2, as amended by the Foreign Trade Anti–Trust Improvements Act, § 6a. Filetech defines the "relevant market" in which it competes as consisting of "data processing services for the creation of address lists intended to be used by clients for marketing purposes and where such lists are extrapolated from an exhaustive and constantly updated data base covering virtually every resident of France." Complaint, ¶ 24. The Filetech plaintiffs seek treble damages and injunctive relief.

### E

Before considering these claims in this Court in greater detail, it is first necessary to describe litigation between Filetech and France Telecom in the courts of France. The fact of the matter is that at least since 1992, and continuing today, Filetech and France Telecom have been suing each other in France on issues arising out of Filetech's desired access to the Orange List. Pertinent proceedings involving Filetech and France Telecom have also taken place before French regulatory agencies. France Telecom has also engaged in litigation with third parties in the French courts which implicates certain disputes between Filetech and France Telecom. The following descriptive narrative of this French litigation is drawn from the parties' briefs, affidavits, subsequent letters of counsel, and exhibits submitted on this motion.

In November 1992, Filetech applied to the Commercial Court of Paris for a temporary restraining order requiring France Telecom to provide Filetech with the Orange List. The Commercial Court denied that application.

In December 1992, Filetech made a similar application to the Conseil de La Concurrence ("Council on Competition"), a French regulatory agency comparable to the Federal Trade Commission in the United States. Filetech asserted antitrust claims against France Telecom based upon French or European Union law. The Conseil de la Concurrence denied Filetech's request for immediate injunctive relief, concluding that Filetech had failed to show irreparable harm caused by France Telecom's refusal to give it the Orange List. Apparently the Conseil has not yet rendered a decision on Filetech's antitrust claims against France Telecom.

On January 5, 1994, the Commercial Court of Paris denied Filetech's request for an order requiring France Telecom to disclose the Orange List to Filetech or "cleanse" Filetech's own list of telephone subscribers to remove the names on the Orange List. France Telecom and its legal advisor characterize that decision as holding "that French law prohibited disclosure of the Orange List to such as Filetech." France Telecom's Main Brief at 17, citing declaration of Emmanuel Michau at ¶ 8. Filetech appealed that order. On February 20, 1995, the Court of Appeals in Paris stayed proceedings in that action pending the outcome of criminal proceedings involving Filetech and Birenbaum, its chief executive officer.

France Telecom initiated those criminal proceedings when, on February 3, 1994, it requested the public prosecutor (the "procureur de la Republique") of Nanterre, France to prosecute Filetech and Birenbaum for what France Telecom regarded as Filetech's unauthorized copying of its data base, in violation of the Data Processing Act. On August 31, 1994, France Telecom initiated criminal proceedings on that basis against Filetech in the Criminal Court of Nanterre.

In a separate proceeding, on June 28, 1994, the CNIL requested a French prosecutor to bring "criminal proceedings against certain of Filetech's executives, charging them with illegally processing personal data without having obtained a receipt of acknowledgment from the CNIL, and with fraudulently collecting personal data." France Telecom's Main Brief at 18, citing Michau Declaration at ¶ 13.

Meanwhile, as noted *supra*, on February 7, 1994, the Court of Appeals of Paris delivered its judgment in *CMS v. Telecom*, which construed the antitrust rules in the European Union treaty to require France Telecom to give its entire non-cleansed directory of telephone subscribers to competing publishers of telephone directories, a decision resulting in the French Government's modification of Ar-

ticle R. 10–1 of the PTT. As also noted *supra,* the French Supreme Court affirmed the Court of Appeal's judgment on May 6, 1996.

Trial went forward before the Criminal Court of Nanterre, France on the previously described criminal charges against Filetech and Birenbaum. On May 7, 1996, the three-judge panel hearing the case held that Filetech and Birenbaum were not guilty of those charges, reasoning that Article R. 10–1 of the PTT was unlawful as applied, since it violated the antitrust articles of the Treaty of Rome which protect competition within the European Union. The Nanterre court dismissed the criminal charges and related civil charges asserted by France Telecom against Filetech and Birenbaum.

The public prosecutor and France Telecom appealed the judgment of the Nanterre court. The appeal was heard by the Court of Appeals of Versailles, which in a recent decision convicted Birenbaum and Filetech of violating Article 226–18 of the French Penal Code, which punishes the violation of a person's legitimate opposition to the data processing of information concerning that person. The Court of Appeals concluded that Birenbaum and Filetech violated the privacy rights of those who put themselves on the Orange List by including their names in marketing lists sold by Filetech to its clients. They were sentenced to pay fines. The Court of Appeals of Versailles does not appear to have directly addressed Filetech's antitrust claims against France Telecom, holding that even if France Telecom violated French or European antitrust laws, that would not justify Filetech's violation of people's privacy rights. Birenbaum and Filetech have announced their intention to appeal this decision to the French Supreme Court.

American counsel for France Telecom also refer in their most recent motion papers to criminal charges and civil litigation brought in the French courts against one Sophie Bargain, described by counsel as "an individual also represented by Mr. Soffer [Filetech's counsel] who operates a direct marketing lists business and who, like Filetech, has utilized the France Telecom directory (containing "Orange List" names) for the purpose of compiling marketing lists." Letter of Francis J. Menton, Jr., dated June 25, 1996, at 2. This litigation took place in the courts of Rennes and Paris.

According to France Telecom's counsel, the Rennes Court of Appeals "affirmed a lower court ruling finding Mrs. Bargain guilty of a criminal violation for processing and selling names which her business had downloaded from the France Telecom electronic directory, including names appearing on the "Orange List," in a manner strikingly similar to that employed by plaintiffs in this action." *Id.* at 2–3. Counsel acknowledge that "the Rennes court did not have jurisdiction to consider the antitrust issues surrounding France Telecom's attempts to safeguard names appearing on the Orange List," *id.* at 2. Counsel go on to say that "in response" to the Rennes decision, Bargain applied to the Paris Court of First Instance for an injunction forcing France Telecom to turn the Orange List over to her. The Court of First Instance denied that application and the Court of Appeals of Paris affirmed. *Id.* at 3–4. I am given copies of all these French court decisions to ponder. France Telecom contends that these decisions support its interpretation of controlling French law.

Counsel for Filetech, responding to *l'affaire Bargain,* argue that Bargain's business is materially different from that of Filetech, and that the governing principles of French law are more comprehensively expressed in the decision of the trial court in Nanterre.

The most recent addition to this *bouillabaisse* of French court and regulatory proceedings is described in a letter from Filetech's American counsel dated October 3, 1996, advising the Court that on September 13, 1996, following a "lengthy investigation" conducted by a French magistrate, the magistrate has indicted (*"mis en examen"*) France Telecom for "having misused the Orange List in a manner incompatible with its lawful objective," and for "having used its dominant position in the relevant market by selling lists at prices that exclude all competition." Filetech's counsel advises this Court that "France Telecom will be ordered to stand trial on these charges unless it can convince the same magistrate that he must

dismiss part or all of the counts in his indictment." Letter of Ron S. Soffer dated October 3, 1996 at 1. One assumes that this is the sort of examining magistrate whose role in French criminal procedure has recently come to the public's attention in the aftermath of the death of the late Princess of Wales. So far as appears from the record on this motion, no further developments have taken place in this criminal proceeding against France Telecom.

In these circumstances, France Telecom and its American affiliate move to dismiss the complaint. The Notice of Motion refers only to "Rule 12(b)" of the Federal Rules of Civil Procedure as authority for the motion.[3] The briefs state three grounds for dismissal, in this order: (1) a declination of jurisdiction under principles of international comity; (2) preclusion under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, of jurisdiction over the only defendant [France Telecom] "whose conduct is at issue"; and (3) a contention that the Sherman Act does not reach France Telecom's challenged activities.

Filetech resists this motion in its entirety. I will consider the asserted grounds for dismissal in the order urged by France Telecom.

## II

France Telecom's first-stated basis for dismissal, to which it devotes the major portions of its briefs, is international comity.

It is somewhat puzzling that France Telecom does not base its first arguments for dismissal upon its contentions under the FSIA and the Sherman Act, since if either of those contentions is well taken the Court lacks subject matter jurisdiction, and according to the Supreme Court's most recent decision on the subject, questions of comity do not arise unless subject matter jurisdiction is first established. *See Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 797 n. 24, 113 S.Ct. 2891, 2909 n. 24, 125 L.Ed.2d 612 (1993) ("Justice Scalia contends that

comity concerns figure into the prior analysis whether jurisdiction exists under the Sherman Act. . . . This contention is inconsistent with the general understanding that the Sherman Act covers foreign conduct producing a substantial intended effect in the United States, and that concerns of comity come into play, if at all, *only after a court has determined that the acts complained of are subject to Sherman Act jurisdiction.*" (emphasis added)). This procedural analysis is applicable to the case at bar, in which France Telecom challenges Sherman Act jurisdiction on the ground that its activities "have not produced any direct, substantial, or reasonably foreseeable effects in the United States." Main Brief at 38. And presumably the Supreme Court would apply the same procedural analysis to a case where subject matter jurisdiction is contested under the FSIA.

But I will place these mysteries aside and address France Telecom's arguments in the order they present them, beginning with the contention that this Court should decline to exercise jurisdiction under principles of international comity.

### A

▪ It is now well settled that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Insurance Co.*, 509 U.S. at 796, 113 S.Ct. at 2909. That domestic effect is a *sine qua non* of American antitrust jurisdiction, even if a defendant's conduct in a foreign country would clearly violate Sherman Act principles. As the Ninth Circuit said recently, "[w]hen we examine foreign conduct to determine if there is an antitrust violation, our jurisdiction is not a foregone conclusion. When foreign conduct is involved, the courts customarily appraise its substantive antitrust significance only after deciding whether the Sherman Act asserts jurisdiction over it. Jurisdictional and substantive inquiries are not wholly indepen-

---

**3.** The Notice of Motion does not specify which of Rule 12(b)'s six subsections defendants rely upon; neither do the briefs of counsel. Judging by the substance of defendants' arguments, I take

it that defendants place primary reliance upon Rule 12(b)(1), which provides for the dismissal of a complaint for lack of subject matter jurisdiction.

dent." *Metro Industries Inc. v. Sammi Corp.*, 82 F.3d 839, 845 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996) (citations and internal quotation marks omitted). The Ninth Circuit has articulated "a jurisdictional rule of reason, to be applied to Sherman Act claims arising out of foreign conduct." *Id.* at 845–46 (citation and internal quotation marks omitted). The factors relevant to that jurisdictional rule of reason, widely adopted in other circuits including the Second, are known as the *"Timberlane"* factors, after the Ninth Circuit decisions giving voice to them. *See Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir.1976) (*Timberlane I* ) and *Timberlane Lumber Co. v. Bank of America,* 749 F.2d 1378 (9th Cir. 1984) (*Timberlane II* ), *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985).

In *Metro Industries,* the Ninth Circuit summarized its *Timberlane* analysis. The jurisdictional rule of reason which determines the Sherman Act's applicability to foreign conduct "requires the weighing of the answers to three questions:"

> Does the alleged restraint affect, or was it intended to affect, the foreign commerce of the United States? Is it of such a type and magnitude so as to be cognizable as a violation of the Sherman Act? As a matter of international comity and fairness, should the extraterritorial jurisdiction of the United States be asserted to cover it?

*Metro Industries,* 82 F.3d at 846. "The comity question alone," the Ninth Circuit continued in *Metro Industries,* citing *Timberlane I,* "requires the consideration of several elements, including:"

> the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects in the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect,

and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad. *Id.*

Second Circuit authority is in accord with the Ninth Circuit's *Timberlane* comity principles. Indeed, Second Circuit caselaw presaged them. After referring to the "balancing tests" of *Timberlane I,* the court of appeals observed in *O.N.E. Shipping Ltd. v. Flota Mercanté Grancolombiana, S.A.,* 830 F.2d 449, 451 (2d Cir.1987), *cert. denied,* 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988), that "[t]he comity balancing test has been explicitly used in this Court. *See Joseph Muller Corp. Zurich v. Societe Anonyme de Gerance et D'Armement,* 451 F.2d 727 (2d Cir.1971) (*per curiam* ), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972)." [4] In *O.N.E. Shipping* the district court applied *Timberlane I* in declining to assert antitrust jurisdiction over a case implicating protective legislation enacted by the Colombian Government. 830 F.2d at 451. The Second Circuit affirmed on the closely related act of state doctrine, *id.* at 452–53, but in the language first quoted, implicitly approved the *Timberlane* factors.

In *Trugman–Nash, Inc. v. New Zealand Dairy Board,* 954 F.Supp. 733, 737 (S.D.N.Y. 1997), I had occasion to consider "whether the *Timberlane* factors constitute controlling law in the Second Circuit." Concluding that they did, I said:

> The issuance in 1987 of the third text of the Restatement of the Foreign Relations Law of the United States adopted the seven-factor analysis which the Ninth Circuit had reiterated in [*Timberlane II* ]. *Restatement (Third)* § 403(2). The Second Circuit applied these factors, derived from the Restatement, in *United States v. Javino,* 960 F.2d 1137, 1142–43 (2d Cir.1992). The *Timberlane* factors were applied by name by the district court in *National Bank of Canada v. Interbank Card Association,* 507 F.Supp. 1113, 1119–1121 (S.D.N.Y.1980), an opinion the Second Circuit affirmed at 666 F.2d 6 (2d Cir.1981).

---

**4.** In addition to citing *Timberlane I* as precedent for a comity balancing test, the Second Circuit

also cited *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir.1979).

*Id.* Applying the *Timberlane* factors in *Trugman–Nash,* I dismissed Sherman Act claims arising out of the effect of New Zealand Government export laws.[5] *See also Transnor (Bermuda) Ltd. v. BP North America Petroleum,* 738 F.Supp. 1472, 1477 (S.D.N.Y. 1990) (Conner, J.) ("In evaluating the interests of a foreign government prior to determining whether to assert jurisdiction over a transaction occurring outside the United States, the courts have generally applied a 'jurisdictional rule of reason,' which seeks to balance the competing interests asserted. The parties agree that the applicable principles of comity among nations is set forth in [*Timberlane II* ].")[6] In *Ensign–Bickford Co. v. ICI Explosives USA Inc.,* 817 F.Supp. 1018, 1032 (D.Conn.1993), District Judge Cabranes (as he then was) cited *Timberlane II* in dismissing a breach of contract claim against a Canadian corporation on grounds of international comity.

### B

Thus it is apparent that in American antitrust jurisprudence, the *Timberlane* balancing tests have exerted a vital force in determining whether or not to apply Sherman Act jurisdiction to foreign conduct. But I must also consider whether that force has been vitiated by two more recent developments: the Supreme Court's decision in *Hartford Fire Insurance,* and the enactment by Congress of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a.

#### (1) The Hartford Fire Insurance Case

In *Hartford Fire Insurance,* American plaintiffs asserted Sherman Act § 1 claims against, *inter alia,* English reinsurers resident in London, who allegedly conspired with others to boycott general liability insurers that used nonconforming insurance forms. Plaintiffs alleged that the conspiracy was specifically intended to restrict the terms of

coverage of commercial general liability available in the United States. The district court, applying the *Timberlane* factors, dismissed the action. On appeal to the Ninth Circuit, the London reinsurers argued that the district court should have declined to exercise antitrust jurisdiction under the principle of international comity. While the Ninth Circuit reversed the district court and reinstated the action, 938 F.2d 919 (9th Cir. 1991), it declared its continuing fealty to the *Timberlane* factors and to international comity as one of those factors. The Supreme Court summarized the Ninth Circuit's holding on that aspect of the case at 509 U.S. at 797, 113 S.Ct. at 2909–10 (emphasis added):

> The Court of Appeals agreed that courts should look to [the principle of international comity] in deciding whether to exercise jurisdiction under the Sherman Act. *Id.,* at 932. This availed the London reinsurers nothing, however. To be sure, the Court of Appeals believed that "application of [American] antitrust laws to the London reinsurance market 'would lead to significant conflict with English law and policy,'" "and that [s]uch a conflict, unless outweighed by other factors, would by itself be reason to decline exercise of jurisdiction." *Id.,* at 933 (citation omitted). But other factors, in the court's view, including the London reinsurers' express purpose to affect United States commerce and the substantial nature of the effect produced, outweighed *the supposed conflict* and required the exercise of jurisdiction in this litigation. *Id.,* at 934.[7]

I have emphasized the phrase "the supposed conflict" because the Supreme Court went on in *Hartford Fire Insurance* to make clear its view that no conflict existed between British and American law of a character to implicate principles of international comity. The Court said at 509 U.S. at 799, 113 S.Ct. at 2910–11 (citations and internal quotations omitted):

---

**5.** An appeal is pending before the Second Circuit.

**6.** Having considered all the factors, Judge Conner decided on the particular facts of the case to exercise antitrust jurisdiction.

**7.** In *Hartford Fire Insurance,* the Supreme Court affirmed the Ninth Circuit in part, reversed it in part, and remanded the case. 509 U.S. at 799, 113 S.Ct. at 2910–11. I need not, for the sake of this opinion, describe the other issues involved in the case.

The fact that conduct is lawful in the state in which it took place will not, of itself, bar application of the United States antitrust laws, even where the foreign state has a strong policy to permit or encourage such conduct. No conflict exists, for these purposes, where a person subject to regulation by two states can comply with the laws of both. Since the London reinsurers do not argue that British law requires them to act in some fashion prohibited by the law of the United States, or claim that their compliance with the laws of both countries is otherwise impossible, we see no conflict with British law.

Having said that, the Court took the pains to add:

> We have no need in this litigation to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity.

*Id.*

Other circuits that have considered the boundaries of comity analysis and the continuing validity of the *Timberlane* factors in the wake of *Hartford Fire Insurance* express somewhat different views. In *United States v. Nippon Paper Industries Co., Ltd.,* 109 F.3d 1 (1st Cir.1997), *petition for cert. filed,* 65 U.S.L.W. 3839 (June 13, 1997), a criminal case, the government charged the defendant Japanese company and other coconspirators with agreeing "to fix the price of thermal fax paper throughout North America." 109 F.3d at 2. The First Circuit upheld jurisdiction under § 1 of the Sherman Act on the ground that defendant's activities, while committed abroad, had a substantial and intended effect within the United States, relying for that conclusion upon *Hartford Fire Insurance.* See 109 F.3d at 8–9. Rejecting the defendant's appeal to international comity, the First Circuit said at 109 F.3d at 8 (emphasis added):

> Comity is more an aspiration than a fixed rule, more a matter of grace than a matter of obligation. In all events, its growth in the antitrust sphere *has been stunted by Hartford Fire,* in which the Court suggested the comity concerns would operate to defeat the exercise of jurisdiction *only in*

*those few cases* in which the law of the foreign sovereign required a defendant to act in a manner incompatible with the Sherman Act or in which full compliance with both statutory schemes was impossible. Accordingly, the *Hartford Fire* Court gave short shrift to the defendants' entreaty that the conduct leading to antitrust liability was perfectly legal in the United Kingdom.

In *Metro Industries, supra,* the Ninth Circuit proclaimed the continuing viability of the *Timberlane* factors which it had originally promulgated. The court held that the plaintiff's allegations of a Korean company's conduct on competition in the United States were sufficient to state a claim for a Sherman Act violation, but that on the merits plaintiff could not establish that it had suffered an antitrust injury. *Metro Industries,* 82 F.3d at 848–49. Before reaching the merits of the claim, the Ninth Circuit rejected the defendant's invocation of international comity, after a review of all the *Timberlane* factors. *Id.* at 847. As to the continuing validity of those factors, the Ninth Circuit said at 82 F.3d at 847 n. 5:

> A foreign country's allowing or even encouraging particular conduct which is prohibited in the United States no longer provides a sufficient basis for finding a conflict between foreign and domestic law. Where a party does not claim that the foreign country's "law requires them to act in some fashion prohibited by the United States ... or claim that their compliance with the laws of both countries is otherwise impossible," there is no conflict between the domestic and foreign law. *Hartford Fire Ins.,* 509 U.S. at 799, 113 S.Ct. at 2911 (reviewing a Ninth Circuit decision in which we applied *Timberlane I* to foreign conduct but found no comity defense). While *Hartford Fire Ins.* overruled our holding in *Timberlane II* that a foreign government's encouragement of conduct which the United States prohibits would amount to a conflict of law, it did not question the propriety of the jurisdictional rule of reason or the seven comity factors set forth in *Timberlane I.*

As between these two expressions of the present state of the comity doctrine following *Hartford Fire Insurance,* I think that the Ninth Circuit's analysis is clearly correct. In *Hartford Fire Insurance* the Court was careful to follow its holding on conflict of laws with the immediate disclaimer that it had no need "to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity." If that language points in any direction, it is towards the continued viability of such other considerations. At the very least, the Court's disclaimer undermines the First Circuit's overbroad reading of *Hartford Fire Insurance* as doing away with all international comity concerns save that of a conflict of laws as defined by that case.

The Second Circuit has considered the application of international comity in two cases decided after *Hartford Fire Insurance: Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733 (2d Cir.1994), and most recently in *In re Maxwell Communication Corp.,* 93 F.3d 1036 (2d Cir.1996).

*Sterling Drug,* a Lanham Act trademark case, held that international comity precluded the broad extraterritorial effect of the district court's injunction. Although no conflict appeared between German and United States law with respect to the parties' concurrent rights thereunder, the Second Circuit held that *Hartford Fire Insurance* did not bar application of the comity doctrine in the context of the case. Chief Judge Newman's opinion, recognizing that the *Hartford Fire Insurance* Court acknowledged the possibility that "a different context ... might implicate other concerns," 14 F.3d at 747, reasoned:

> "It is one thing for the British underwriters in *Hartford Fire* to be barred under United States law from boycotting activity that they might be free to engage in without violating British law. But it is quite a different thing for the holder of rights in a mark under German law to be ordered by a United States court to refrain from uses of that mark protected by German law."

*Id.* at 746–47. Remanding the case, the court of appeals observed that consideration of the parties' legitimate interests "must re-

ceive especially sensitive accommodation in the international context," and directed the district court "to fashion an appropriately limited injunction with only those extraterritorial provisions reasonably necessary to protect against significant trademark-infringing effects on American commerce." *Id.* at 747.

*In re Maxwell Communication Corp.* arose out of the death of the British media magnate Robert Maxwell and the bankruptcy of his British corporation, Maxwell Communication Corporation plc. Those events resulted in what the Second Circuit described as "a unique judicial administration of the debtor corporation by parallel and cooperative proceedings in the courts of the United States and England aimed at harmonizing the laws of both countries and also aimed at maximizing the benefits to creditors and the prospects of rehabilitation." *In re Maxwell Communication Corp.,* 93 F.3d at 1040. The Maxwell corporation filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court for this district. The next day, the corporation petitioned the High Court of Justice in London for an administration order, "the closest equivalent in British law to Chapter 11 relief." 93 F.3d at 1041. The American bankruptcy court appointed an "examiner" to, *inter alia,* administer the debtor's estate, and to work in harmony with the "administrators" appointed by the British court.

A jarring note was introduced into that harmony when the bankruptcy court examiner instituted in the bankruptcy court adversary proceedings against British and French banks to recover allegedly preferential payments made to them by the debtor. The examiner relied upon the avoidance provisions of the United States Bankruptcy Code, 11 U.S.C. § 547(b). Affirming the bankruptcy court and the district court, the Second Circuit held that "in this unique case involving cooperative parallel bankruptcy proceedings seeking to harmonize two nations' insolvency laws for the common benefit of creditors, the doctrine of international comity precludes application of the American avoidance law to transfers in which England's interest has primacy." *Id.* at 1054–55.

In reaching that conclusion, the Second Circuit stated flatly that "[i]nternational comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction," citing *Hartford Fire Insurance*, 509 U.S. at 798, 113 S.Ct. at 2910, and Justice Blackmun's dissent in *Societe Nationale Industrielle Aerospatiale v. District Court*, 482 U.S. 522, 555, 107 S.Ct. 2542, 2561–62, 96 L.Ed.2d 461 (1987) (when analyzing treaty in light of concept of international comity, existence of a true conflict is a "threshold question."). *In re Maxwell Communication Corp.*, 93 F.3d at 1049. The *Maxwell* court then went on to find that a "true conflict" existed between American and British bankruptcy avoidance laws, thereby satisfying the comity requirement of *Hartford Fire Insurance*. *Id.* at 1050 (because "the parties in the present action have assumed that the 'intent' requirement in the English law would dictate a different distributional outcome than would United States law, ... it is not possible to comply with the rules of both forums and the threshold requirement of a true conflict exists for purposes of comity analysis.") *Id.*[8]

Having crossed the threshold of a true conflict between national laws, the Second Circuit in *Maxwell* applied classic *Timberlane* analysis in determining that England's interest "has primacy," thereby warranting dismissal of the American proceedings. While Judge Cardamone's comprehensive opinion cites § 403(2) of the Restatement (Third) of the Foreign Relations Law of the

United States (1986) for the relevant factors,[9] there is a direct line of succession between that section and the Ninth Circuit's formulation in its *Timberlane* decisions, which relied upon the Restatement's prior edition. *See Timberlane I*, 549 F.2d at 614 n. 31 (citing § 40 of the Restatement (Second) as a source of the factors to be considered in applying a jurisdictional rule of reason to the exercise of extraterritorial jurisdiction in antitrust cases). In *Maxwell*, the Second Circuit applied these factors in determining that international comity warranted the bankruptcy court's dismissal of adversary proceedings under the Bankruptcy Code with respect to the transactions at issue.

What guidance may this Court derive from these post-*Hartford Fire Insurance* decisions in the Second Circuit, which are of course binding upon me to the extent that they are applicable to the facts at bar?

First, I think it clear that the Second Circuit does not wholly accept the Ninth Circuit's view of *Hartford Fire Insurance*'s effect upon what I have called the *Timberlane* factors, at least in antitrust cases. As I read *Metro Industries*, 82 F.3d at 847 n. 5, quoted *supra*, the Ninth Circuit's position is that *Hartford Fire Insurance* may have raised the bar on showing a conflict of laws, but left the other six factors (which the case did not implicate and the Supreme Court did not discuss) unaffected, together with the jurisdictional rule of reason, so that a combination of the other factors could warrant dismissal of a Sherman Act case, even in the

---

**8.** The Second Circuit in *Maxwell* also referred to *Hartford Fire Insurance's* statement that " 'other concerns' might be implicated if the context were different," 93 F.3d at 1049, citing its prior opinion in *Sterling Drug* as an example.

**9.** In considering whether the United States Bankruptcy Code should be given extraterritorial effect, the Second Circuit cited and quoted § 403(2) of the Restatement in stating:

Whether so legislating would be "unreasonable" is determined "by evaluating all relevant factors, including, where appropriate," such factors as the link between the regulating state and the relevant activity, the connection between that state and the person responsible for the activity (or protected by the regulation), the nature of the regulated activity and its importance to the regulating state, the effect of the

regulation on justified expectations, the significance of the regulation to the international system, and the likelihood of conflict with other states' regulations.

*In re Maxwell Communication Corp.*, 93 F.3d at 1048. I think it clear from Judge Cardamone's preceding discussion, 93 F.3d at 1047, that in the context of the *Maxwell* case these factors would apply to both doctrines that may be embraced by the concept of international comity: "as a canon of construction," shortening "the reach of a statute," and "as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts." Since it is well established that the Sherman Act has extraterritorial effect if the conduct abroad has sufficient intended impact upon American commerce, the case at bar turns upon the second of these two conceptual doctrines.

absence of any conflict between American and foreign law. If that is in fact the Ninth Circuit's view, it seems to me entirely consistent with the Supreme Court's disclaimer in *Hartford Fire Insurance*, 509 U.S. at 799, 113 S.Ct. at 2911, quoted *supra*, that the Court had no need in the case "to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity."

But the Second Circuit's rationale in *Maxwell* appears to identify the existence of a true conflict of law as the threshold requirement, the condition precedent, the *sine qua non*, of any international comity analysis. To be sure, the Second Circuit's earlier *Sterling Drug* decision did not find it necessary to identify a specific conflict with German law in order to limit an American court's Lanham Act injunction in the name of comity. In *United States v. Javino*, 960 F.2d 1137 (2d Cir.), *cert. denied*, 506 U.S. 979, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992), denying extraterritorial effect to an American firearms statute, Judge Kearse said in *dictum* that comity considerations articulated in the Restatement (Third), § 402, would militate against that effect "[i]n light of the substantial interests that other countries have in regulating the manufacture of firearms within their own borders," without identifying a specific conflict with any foreign law. But *Maxwell* is, I believe, the Second Circuit's most recent pronouncement in the comity area; and the case at bar, unlike both *Sterling Drug* (Lanham Act) and *Maxwell* (Bankruptcy Code), arises under the Sherman Act, as did *Hartford Fire Insurance*, so that the Supreme Court's decision in that case cannot be distinguished on the ground that a different statute is involved.[10]

■ I conclude, therefore, that under controlling Second Circuit law, a party seeking the dismissal of a Sherman Act case on the ground of international comity must first demonstrate that a true conflict exists between the Sherman Act and relevant foreign law.

■ Second, *Maxwell* and the earlier Second Circuit cases cited *supra* hold that, once the threshold barrier of conflict of law is passed, comity analysis in this circuit looks to the same factors described by the Ninth Circuit in the *Timberlane* cases and in the Restatement.

What of the case at bar? It differs from the other cases in that the parties dispute whether a conflict of laws exists, or, to state the matter more precisely, whether the Sherman Act would require France Telecom to do what French law prohibits it from doing. No comparable dispute arose in *Hartford Fire Insurance*, where the parties agreed that English law did not prohibit the London reinsurers from conducting themselves in compliance with the Sherman Act; or in *Maxwell*, where the parties agreed that American and English bankruptcy avoidance laws would produce different and hence conflicting results with respect to the transactions at issue.

■ The most that can be said in the case at bar is that France Telecom has asserted a substantial claim that its conduct gives rise to a conflict between the requirements of the Sherman Act and of French law. Is such a claim sufficient to satisfy the Second Circuit's threshold comity requirement of a "true conflict" between the laws of the United States and France? While I have found no case squarely addressing that question, I think that it must be answered in the affirmative, for two reasons. First, any conflict between what the Sherman Act may require and French law may forbid goes to the heart of the case, including, significantly, the propriety of this Court's enjoining France Telecom's conduct in ways that may violate French law and regulations.[11] Second, it is far more appropriate that the French courts, in the course of the continuing litigation in France between these same parties on these same issues, declare what French law is,

---

10. One must also not lose sight of the fact that in *Maxwell* the Second Circuit looked to *Hartford Fire Insurance* in articulating the true conflict requirement, although *Maxwell* arose under the Bankruptcy Code, and not the Sherman Act.

11. That factor is reminiscent of the Second Circuit's concerns about the extraterritorial breadth of the district court's injunction in *Sterling Drug*.

rather than leaving that determination to be made by an American court.

Accordingly I conclude that unless the FTAIA requires a different result, this Court may submit France Telecom's motion to dismiss Filetech's complaint to classical comity analysis.

### (2) The FTAIA

■■■ Under the FTAIA, 15 U.S.C. § 6a, enacted by Congress in 1982, the Sherman Act does not apply to conduct involving foreign trade or commerce, unless "such conduct has a direct, substantial, and reasonably foreseeable effect" on domestic or import commerce.[12] The Supreme Court said in *Hartford Fire Insurance* that "[t]he FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy," adding that "it is unclear how it might apply to the conduct alleged here." 509 U.S. at 796 n. 23, 113 S.Ct. at 2909 n. 23. I think that the application of the FTAIA to the case at bar is also unclear, but it is necessary to conjure with the statute, because in *O.N.E. Shipping Ltd.*, 830 F.2d at 451, the Second Circuit said that Congress enacted the FTAIA "[i]n an effort to provide a single standard to determine whether American antitrust laws apply to a given extraterritorial transaction." That statement raises the question whether the Second Circuit regards the FTAIA as having put an end to the *Timberlane* balancing tests, which of course include factors other than that specified in the FTAIA.

I do not think that *O.N.E. Shipping Ltd.* can be read in that fashion. In the first place, the district court in *O.N.E.* dismissed the complaint on the basis of the *Timberlane* comity factors, *see* 830 F.2d at 451–52, without finding it necessary to consider the

FTAIA, and the court of appeals did not say the district court was wrong in having done so. Second, the court of appeals affirmed the dismissal on the comity-related ground of the act of state doctrine, which is not mentioned in the FTAIA. Third, the Second Circuit has applied or approved the *Timberlane* factors in cases subsequent to *O.N.E. Shipping Ltd.* And finally, the Supreme Court in *Hartford Fire Insurance*, while leaving open the question whether a case falling within the jurisdiction created by the FTAIA could ever be dismissed on comity grounds, 509 U.S. at 798, 113 S.Ct. at 2910, observed that when it enacted the FTAIA, "Congress expressed no view on the question whether a court with Sherman Act jurisdiction should ever decline to exercise such jurisdiction on the grounds of international comity," and then quoted H.R.Rep. No. 97–686, p. 13 (1982): "If a court determines that the requirements for subject matter jurisdiction are met, [the FTAIA] would have no effect on the court['s] ability to employ notions of comity ... or otherwise to take account of the international character of the transaction" (citing *Timberlane* ). While the wording of the FTAIA is silent on the subject, the portion of legislative history quoted by the *Hartford Fire Insurance* Court would seem to point clearly toward the continuing effect of the *Timberlane* factors, particularly since the House Report referred to that case by name.

I conclude, therefore, that the *Timberlane* factors provide the appropriate standards for deciding whether this Court should exercise jurisdiction in this case. I now proceed to apply those factors.

### III

The first *Timberlane* comity factor is the degree of conflict with foreign law or policy.

---

**12.** 15 U.S.C. § 6a reads in full:

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
(1) such conduct has a direct, substantial, and reasonably foreseeable effect—
(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.
If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then section 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

That is the factor the Supreme Court considered in *Hartford Fire Insurance.*

### A

The case at bar differs from *Hartford Fire Insurance* because, unlike the London reinsurers in that case, France Telecom argues throughout that French law prohibits it from revealing the Orange List to Filetech, even if its refusal to do so violates the Sherman Act. *See, e.g.,* Reply Brief at 33 ("[T]he unambiguous language of article R.10–1 and the policy determination underpinning the Saffron List resolution preclude France Telecom from disclosing the Orange List to Filetech.").

This American trial judge, encumbered by the difficulties inherent in interpreting the decrees of foreign courts and governmental bodies, cannot discern in the profusion of French court decisions and regulatory pronouncements described in Part I of this opinion an explicit declaration that France Telecom would violate French law by revealing the. Orange List to Filetech in the manner requested by Filetech. Nor am I able to discern an explicit declaration that, as Filetech contends, the disclosure of the Orange List by France Telecom to Filetech not only would not violate French law, but is mandated by French domestic law as supplemented by the antitrust rules of the Treaty of Rome.

The parties argue strenuously for these diametrically opposing interpretations of French law. In the best tradition of advocates the world over, counsel at bar give different readings to the several court decisions, which do not appear to be (to the extent I am able to judge the matter) wholly consistent with each other. When a particular decision appears to favor one of the parties at bar, that party proclaims the decision as determinative of every issue in the case at bar, while the other party says it has nothing to do with them. The parties' discussion of the decision of the Court of Appeals of Paris in *CMS v. France Telecom,* affirmed by the Supreme Court of France, is typical. Filetech says that decision, explicitly or by necessary implication, rejects all of France Telecom's arguments on the effect of French law. France Telecom says that the case related only to the rights of competing publishers of telephone directories and has nothing to do with a direct marketing service company like Filetech.. I lack the competence to say with any confidence who is right, although the French Government's modification of Article R. 10–1 of the PTT Code in response to the Paris Court of Appeals' decision in *CMS* would seem to argue for a narrow reading of the case's effect. There was no joy for France Telecom (or the public prosecutor) in the decision of the trial court at Nanterre, but that decision has now been reversed in a manner unfavorable to Filetech. It also appears that French courts and a regulatory agency have rejected Filetech's applications for the injunctive relief in respect of the Orange List that Filetech seeks to obtain from this Court in this action. And the most recent development in the French courts is a criminal indictment of France Telecom by a French magistrate on what sound like antitrust charges, to which France Telecom will presumably make defenses consistent with the theories it has asserted in France and now in this Court.

What is one to make of all this? Having considered these French authorities and proceedings to the best of my non-Gallic ability, I am unable to conclude whether or not the release of the Orange List by France Telecom to Filetech would violate French law. Were I to conclude that it would, I read *Hartford Fire Insurance* as requiring dismissal on the ground of international comity. But the most I can conclude from this record is that France Telecom has asserted in the French courts a substantial claim that controlling French law and public policy preclude releasing the Orange List to Filetech in aid of direct marketing. I am not able to conclude, from this assortment of French trial and appellate decisions and regulatory declarations, that France Telecom's claim has been rejected at the highest level of French jurisprudence or regulation.

I hold that France Telecom's substantial claim, consistently asserted in France and not yet finally adjudicated there, is sufficient to implicate the first *Timberlane* factor. If France Telecom is correct in its position under French law and policy, the Sherman Act's "degree of conflict with foreign law or

policy" is total. I think that comity requires that the courts and Government of France make the final decision as to whether France Telecom's conduct violates the laws and policies of France. There are two reasons. First, the French courts are obviously better able to decide what French law and policy require or condemn.[13] Second, it is inappropriate to ask an American court to enjoin the conduct of a French governmental entity in France in a case where the risk arises—to put it no higher than that—of a conflict between the American court's injunction and French law or policy.

So I conclude that the first *Timberlane* factor requires dismissal of the case at bar on the ground of comity. But if that factor alone does not require that conclusion, it surely does when viewed in conjunction with other *Timberlane* factors.

### B

The other *Timberlane* factors include the nationality or allegiance of the parties and the locations of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad. *Timberlane I*, 549 F.2d at 614.

■ It does not require extended discussion to demonstrate that most of these factors militate in favor of dismissing the complaint on the ground of international comity. The two primary parties are Filetech and France Telecom. One is a French corporation; the other is an entity of the French

Government; their principal places of business are in France.

If, as Filetech has consistently maintained, France Telecom's conduct with respect to the Orange List violates the antitrust laws of both France and the European Union, enforcement by the French courts may be better expected to achieve compliance with the principles for which Filetech contends.[14] Indeed, if litigation of comparable antitrust claims is permitted to go forward in both France and the United States, the resulting potential for international conflict furnishes a particular basis for dismissal in the interest of comity. *Cf. Ensign–Bickford Co.*, 817 F.Supp. at 1032 ("[T]his action presents the prospect of a conflict between a decision by this court and a decision by a Canadian court. The potential for conflict arises because the plaintiff has initiated an action in a Canadian court alleging a breach of the same contractual provisions that provide the basis for the breach-of-contract claim in this matter."). In the case at bar, the claims and defenses asserted in the French proceedings appear to mirror the issues arising out of Filetech's Sherman Act claim in this Court.

The parties dispute the effects of France Telecom's conduct upon the United States. Filetech says that effect is substantial; France Telecom says it is minimal, bordering upon the non-existent. Comparable disputes with respect to another *Timberlane* factor, the extent to which there is explicit purpose to harm or affect American commerce, and the foreseeability of such effect. But it is crystal clear that other, related factors militate in favor of dismissal: the relative significance of the effects of France Telecom's conduct on the United States as compared with France; and the relative importance of conduct within the United States as compared with conduct abroad.

In those regards, it bears recalling that France Telecom's electronic telephone direc-

---

**13.** While American courts are not infrequently required to determine foreign law, usually after considering diametrically opposing opinions submitted by qualified foreign advocates, the typical case, unlike that at bar, does not involve ongoing litigation in the foreign country involving the same claims and issues.

**14.** If Filetech succeeds on the legal theories asserted in France, most recently in the form of the French magistrate's indictment of France Telecom, there is no reason to suppose that the French courts would not grant to Filetech appropriate injunctive relief, of the sort Filetech seeks in this Court.

tory is limited to individuals and entities resident *in France.* The direct marketing mailings contemplated by Filetech will all be to addressees *in France.* If, in consequence of Filetech's business operations and those of its clients, unsolicited and unwelcome brochures and fliers cause mailboxes to overflow, all those mailboxes will be *in France.*[15] If such a consequence offends public policy, it is the public policy *of France.*

Filetech's 38–page, 80–paragraph complaint describes at length its aspirations and France Telecom's conduct, but the allegations concerning the effect of that conduct upon American commerce are scant. They deal exclusively with the thwarting of Filetech's desire to achieve "[o]ne of Mr. Birenbaum's primary business objectives," namely, making "the French consumer market more accessible to foreign countries and notably Americans who sell their products and services on a worldwide basis." Complaint, ¶ 19. To that desired end, Birenbaum "has facilities available for his business use located in New Jersey" (this is apparently a reference to Filetech USA), *id,* ¶ 20, and, were it not for France Telecom's anticompetitive conduct directed at Filetech, "the organization of plaintiff Filetech USA would have been long before it was actually organized in 1994, in order to carry out the business activities envisioned by Mr. Birenbaum," *id.,* ¶ 21. This theme is stated early in the complaint; ¶ 6 alleges that by its conduct relevant to the Orange List, "France Telecom has prevented Plaintiff Filetech SARL from realizing one of its main objectives, that is, to compete over [sic] the U.S. market, either directly or indirectly using a New York subsidiary as its marketing and sales arm in the

U.S. ..." The complaint also alleges that France Telecom "either directly or indirectly through France Telecom Inc., engages in substantial commercial activity in the United States, including the one on which this action is based," *id.,* ¶ 41, the latter assertion apparently being based upon the allegation that France Telecom "competes in the Relevant Market by providing two retail services [Marketis and Teladresses] to its customers seeking to obtain particular categories and types of client address lists," *id.,* ¶ 47.

Assuming for the present that these allegations are both true in fact and sufficient in law to state a claim under the Sherman Act, a question considered under Point IV, it is readily apparent for the purpose of comity analysis that the effects of France Telecom's conduct on the United States (limited to the thwarting of one of Filetech's several business objectives) are far less significant than its effects in France; and that the fundamental commercial importance of France Telecom's activities arises out of its conduct in France, as opposed to any conduct in the United States.

■ Accordingly I conclude that all the *Timberlane* factors, which constitute the law in the Second Circuit as well as in the Ninth, militate in favor of dismissing the complaint at bar on the ground of international comity.[16] The Court will dismiss that complaint on that ground.

### IV

■ France Telecom's second and third grounds for dismissing the complaint are that the FSIA precludes subject matter jurisdiction over France Telecom, which defendants assert is the only defendant "whose conduct

---

**15.** I express no view with respect to the economic, social, or spiritual virtues or vices of direct mail marketing. The purpose of the discussion in text is simply to set forth the practical realities of the case.

**16.** Because France Telecom does not specify which subsection of Rule 12(b) it is moving under, its briefs do not discuss what material the Court may consider in deciding the motion. If this were a Rule 12(b)(6) motion, I could not consider any evidentiary material outside the complaint without converting the motion into one for summary judgment under Rule 56 and giving the parties notice to that effect, which might require further discovery under Rule 56(f).

But the Ninth Circuit has said in *Metro Industries,* 82 F.3d at 846, that while dismissal "based upon the first two prongs" of *Timberlane I* analysis (the effect upon the foreign commerce of the United States and its type and magnitude) "would likely require Rule 56 treatment and an absence of a dispute about material facts, dismissal under Rule 12(b)(1) based on comity considerations is permissible." *See also Ensign–Bickford Co.,* 817 F.Supp. at 1023 ("The consideration of materials outside the complaint on a motion to dismiss pursuant to Rule 12(b)(1) does not convert the motion to one for summary judgment pursuant to Rule 56.") (citation omitted).

is at issue" in the case,[17] and that the conduct alleged does not fall within the Sherman Act.

Both grounds turn upon the degree of commercial activity carried on by France Telecom in the United States, an issue that the parties dispute. As for the FSIA, 28 U.S.C. § 1605(a)(2) provides that a foreign state [18] is not immune from the jurisdiction of United States courts if the action is based on commercial conduct or acts carried on or performed in the United States, or elsewhere if the act causes a direct effect in the United States. The Second Circuit has said that the statute requires that "a significant nexus exist between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action." *NYSA–ILA Pension Trust Fund v. Garuda Indonesia*, 7 F.3d 35, 38 (2d Cir.1993), *cert. denied*, 510 U.S. 1116, 114 S.Ct. 1065, 127 L.Ed.2d 384 (1994).

█ As for the Sherman Act, subject matter jurisdiction of the district courts depends upon whether the foreign conduct at issue "was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Insurance*, 509 U.S. at 796, 113 S.Ct. at 2909 (citations omitted).

█ On this motion to dismiss on these particular grounds, I look only to the complaint, to determine whether Filetech "has made the minimal allegations about the impact on competition in the United States necessary to state a claim for a Sherman Act

violation," *Metro Industries*, 82 F.3d at 847, an analysis that also applies to the FSIA issue. While Filetech's allegations are sparse and largely conclusory, I think that they meet that undemanding standard.[19]

Accordingly, in the present posture of the case, I deny defendants' motion to dismiss the complaint on either of these grounds.

However, for the reasons stated, the Clerk of the Court is directed to dismiss the complaint on the ground of international comity.

It is SO ORDERED.

---

17. That assertion is based upon an affidavit by a France Telecom executive, Dominique Rimbault, to the effect that the subsidiary defendant, France Telecom Incorporated, "has no involvement in any aspect of the marketing lists business." Main Brief at 31.

18. It is common ground that France Telecom constitutes an entity of a foreign state for FSIA purposes.

19. In *Ensign–Bickford Co.*, 817 F.Supp. 1018 at 1023 n. 7, Judge Cabranes, citing Third Circuit authority, *Mortensen v. First Federal Savings & Loan Association*, 549 F.2d 884, 891 (3d Cir. 1977), adopted the view that on a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, "the trial court may proceed as it never could under [Rule] 12(b)(6) or Fed. R. Civ. P. 56." Judge Cabranes reasoned that because the issue "in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—... no presumptive truthfulness

attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

While this approach would grant me greater decisional latitude in the case at bar, I think it is better, even on a Rule 12(b)(1) motion, at least where the parties vigorously contest the existence *vel non* of controlling jurisdictional facts, to use the Ninth Circuit's approach in *Metro Industries*, assume the truth of plaintiffs' allegations, and test them for legal sufficiency.

It follows that this Court's denial of defendants' second and third asserted grounds for dismissal are without prejudice to their reassertion after discovery, if the Court of Appeals reverses the dismissal of the complaint on the first ground of international comity. It is perhaps appropriate to add that, in clarifying that procedural point, I do not mean to suggest any lingering doubt, at least on my part, with respect to the conclusion that comity requires dismissal.