**FILETECH S.A. and Filetech U.S.A., Inc. Plaintiffs,**

v.

**FRANCE TELECOM, S.A. and France Telecom, Inc., Defendants.**

**No. 95 Civ. 1848(CSH).**

United States District Court, S.D. New York.

March 20, 2001.

---

Ron Soffer, New York City, for plaintiff.

Wilkie Farr and Gallagher, New York City (Francis J. Menton, Jr., Thomas Golden, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

On remand from the Court of Appeals, this Court is again presented with the question whether a French corporation and its American subsidiary may properly invoke the anti-trust laws of the United States to challenge the conduct of another French corporation, albeit an independent public legal body, whose conduct, the plaintiff alleges, violates the Sherman Act, 15 U.S.C. § 2. The case is before the Court on the defendants' motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. Pro. 12(b)(1).

### FACTUAL BACKGROUND

The factual background of this case is discussed in two prior opinions, *Filetech S.A.R.L. v. France Telecom*, 978 F.Supp. 464, 466 (S.D.N.Y.1997), *vacated and remanded Filetech S.A. v. France Telecom*, 157 F.3d 922 (2d Cir.1998). While familiarity with these opinions is assumed, the following discussion will benefit from a restatement of the facts.

The plaintiff, Filetech S.A. ("Filetech"), formerly known as Filetech S.A.R.L., is a French corporation established by a Frenchman, Guy Birenbaum, for the purpose of assembling a database of information from which to sell marketing lists. Filetech primarily sells data collected in France to French businesses, though, as this lawsuit makes clear, it aspires to penetrate additional markets. To that end, Filetech incorporated Filetech U.S.A., Inc. in 1994 in the State of New York to handle the parent company's nascent U.S. operations. Filetech has registered its business office in the State of New Jersey, though according to the record no business has been conducted there. I will refer to the corporations collectively as "Filetech" or "plaintiff."

The defendant, France Telecom S.A. ("France Telecom"), is a French corporation with its principal place of business in France. At the time the complaint was filed, France Telecom was an independent public legal entity, wholly owned and operated by the Republic of France, controlling all telephone facilities in the Republic. Directives of the European Union have subsequently ended this monopoly and required the government of France to reduce itself to majority shareholder status in what is now a publicly traded company. France Telecom, Inc. is the wholly owned subsidiary of France Telecom, incorporated in the State of New York with its principal place of business there.

France Telecom engages in commercial activities beyond the provision of telephonic service to the people of France. Among other things, France Telecom al-

lows access to its data base of telephone subscribers for the purpose of developing marketing lists. Such access, however, is burdened by the existence of the "Orange List," a subject of some controversy in this dispute.

The Orange List came into existence as the result of French statutes and regulations. In January 1978 the French legislature enacted the Data Processing and Individual Rights Law ("the Act") which created the Data Processing and Individual Rights National Commission, popularly known as "CNIL." CNIL regulates public and private data processing activities. The Act also set forth substantive and procedural rules on processing this data. Pursuant to Article 26 of the Act, any individual may in good faith refuse to allow personal data bearing on him or her to be computer processed. Breach of this Article is punishable under the French penal code. Consistent with the Article, French law permits French residents to prevent inclusion of their names on commercial mailing lists.[1] Pursuant to this law, France Telecom is required to maintain a current list of telephonic subscribers who do not want their names used for marketing purposes. This compilation of names is called the Orange List.

France Telecom maintains that it is forbidden by French law from disclosing the names of the individuals on the Orange List, and it has accordingly refused to give Filetech, or any other requester, such information.[2] Instead, France Telecom offers services which allow customers to purchase information from its database purged of the Orange List entries. Filetech has long argued that such a position ensures a monopoly for France Telecom, since no other data base provider has possession of the Orange List, without which no other provider can be kept apprized of which French residents may have requested to be placed on the List or, for that matter, taken off it. Without a regularly updated copy of the Orange list, says Filetech, no company in the commercial mailing list business can safely market its services without the risk of violating French law. The Orange List is akin to a map indicating the placement and movement of land mines in a desert; without the map, no one dares to traverse the territory. Currently, Filetech argues, France Telecom alone has a regularly updated copy of that "map," without which Filetech is prevented from competing against France Telecom in the marketing list business.[3]

In addition to the case at bar, Filetech has commenced numerous legal actions in

1. By decree dated October 12, 1989, amended December 29, 1990, Article R. 10–1 of France's Postal and Telecommunications Code provides, "All individuals ... may ... request, without being liable to pay any supplemental fee, not to appear on the lists extracted from the telephone book and marketed by [France Telecom].... The use by anyone, of information extracted from the telephone book concerning persons mentioned in the previous paragraph, for commercial purposes or for public diffusion, is prohibited."

2. It was stated at oral argument in this motion, following remand and discovery, that pursuant to an order by the French Court of

Appeals, an updated list of subscribers purged of the Orange List names *was* provided to Filetech in 1999. The Orange List itself, however, has not been provided. Transcript of Oral Argument, December 18, 2000 ("Transcript of Oral Argument") at 21, 39–40.

3. Filetech believes that France Telecom's recent delivery of the entire data base, save the Orange List, is insufficient, since the Orange List is constantly changing in content. Further, as discussed below, Filetech argues that France Telecom's monopoly over the list itself forces all of its competitors to be permanent customers, rather than competitors, of France Telecom. Transcript of Oral Argument at 40.

France against France Telecom. That litigation, some of it begun nearly a decade ago, appears to be unresolved.[4] It is sufficient for present purposes to note, as did the Second Circuit, that "as far as this Court can tell, based in part on a lack of final decisions on the merits and on the seemingly conflicting dictates of French judicial and regulatory authorities, it remains unsettled in France what conduct is permissible on the part of France Telecom S.A. and Filetech S.A. with respect to the marketing lists business." *Filetech S.A.*, 157 F.3d at 928.

Until recently, France Telecom had made data from its list of subscribers available to third parties principally through two services, "Teladresses" and "Marketis."[5] Since the telephone directories themselves contain the Orange List names, only these two services perform the function of purging such entries and delivering a legally acceptable list to customers. Marketis is a service accessible through either a personal computer equipped with a modem, or through "Minitel," a terminal provided by France Telecom to its customers upon request. Through either of these two methods a tailored list purged of Orange List names can be created. Teladresses is a nonelectronic service enabling a customer to order from France Telecom a list with specific, tailored information. France Telecom generates the list, purged of the Orange List entries, and sends it to the customer with a bill for services. According to France Telecom, Marketis is designed for those looking to compile small lists, while Teladresses allows for the compilation of millions of entries.

Though for a time Filetech was apparently able to circumvent this system requirement, France Telecom limits free access through Minitel to three minutes, in part to prevent massive, costless downloading of its information. In other words, companies seeking to create large scale databases of information from the telephone directory are left with no alternative but, in one way or another, to compensate France Telecom for its services. Because acquisition of a comprehensive, regularly updated, cleansed list from France Telecom, through Teladresses, would allegedly cost millions of dollars, Filetech contends that this regime prevents competition in the market. Filetech, since the inception of this litigation, repeatedly alleges that France Telecom's monopolistic behavior, in refusing to supply others with the Orange List, constitutes a violation of French and U.S. law.

**4.** Since the Court is not regularly briefed by the parties on developments in the French courts, I can only state here what has been provided on the record by the parties. The Court of Appeals summarized the earlier stages of the French litigation in *Filetech S.A.*, 157 F.3d at 927–28. The latest developments appear to be as follows. On June 29, 1999 the Paris Court of Appeals affirmed the substance of the Conseil de la Concurrence's decision of September 29, 1998, which found France Telecom's conduct with respect to the Orange List violated French and European Union competition law, and directed France Telecom to provide any requesting party with a cleansed copy of the telephone directory. That decision has been appealed to the Supreme Court of France. In 1999 France Telecom provided Filetech with a directory cleansed of the Orange List, with the proviso that they either pay the required price or allow a French court to determine such price. Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint for Lack of Subject Matter Jurisdiction ("Defendants' Memorandum") at 7.

**5.** Recently France Telecom transferred its mailing list activities to a new subsidiary called Mediatel. Mediatel has decided to discontinue Marketis, but now operates Teladresses under the Mediatel name. Defendants' Memorandum at 5. The name "Marketis" is retained in text because it existed during most of the period under discussion.

## PROCEDURAL HISTORY

In 1995 Filetech filed suit in this Court against France Telecom, charging it with monopolization in violation of the Sherman Act. 15 U.S.C. § 2. Filetech seeks treble damages and injunctive relief from France Telecom's alleged restraints on trade in the United States. Filetech also demands access to France Telecom's directory without paying the charges normally incurred through the use of Marketis or Teladresses.

On June 5, 1995 France Telecom moved to dismiss the complaint, pursuant to Fed. R.Civ. Pro. 12(b),[6] the doctrine of international comity, and because the district court lacked subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.A. § 1605(a)(2), and the Sherman Act, as amended by the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C.A. § 1, 6a (West 1997).

On September 15, 1997 this Court dismissed Filetech's complaint. Though concluding that Filetech's allegations, while "sparse and largely conclusory," satisfied the standards for jurisdiction imposed by the FSIA and the FTAIA, the Court declined jurisdiction on the grounds of international comity. *Filetech S.A.R.L.*, 978 F.Supp. at 482.

In 1998 the Court of Appeals vacated that holding and remanded the case to this Court with instructions that the Court first determine whether subject matter jurisdiction exists, prior to considering the question of international comity. *Filetech S.A.*, 157 F.3d at 932. The Second Circuit said that "[i]t appears to us that the case at bar presents substantial and unresolved questions in regard to jurisdiction over France Telecom under the FSIA, the FTAIA and the caselaw governing Sherman Act jurisdiction." *Id.* at 931. The Court continued as follows:

> [I]t was error for the district court to accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction.... In these circumstances, the court should have looked outside the pleadings to the submissions. The district court should consider all the submissions of the parties and may hold an evidentiary hearing, if it considers such a hearing is warranted, in resolving the question of jurisdiction. Before arriving at its legal conclusion regarding the existence *vel non* of subject matter jurisdiction, the district court should resolve the disputed factual matters by means of findings of fact.

*Id.* at 930–31.

Following this ruling by the Second Circuit, this Court directed the parties to conduct discovery on the question of subject matter jurisdiction. Following completion of that discovery, defendants now move to dismiss the case for lack of subject matter jurisdiction under the FTAIA and the FSIA.

## DISCUSSION

On remand from the Second Circuit, the Court is required to decide whether Filetech has demonstrated the existence of subject matter jurisdiction in this case.

The Court here considers the motion after months of extensive discovery on the question of subject matter jurisdiction. This Court has been directed by the Second Circuit to rely on "all the submissions of the parties." *Filetech S.A.*, 157 F.3d at 930–31. The Court is to "resolve disputed factual matters by means of findings of

---

**6.** France Telecom failed to specify the subsection of Rule 12(b) under which it was moving.

*Filetech S.A.R.L.*, 978 F.Supp. at 472 n. 3.

fact" rather than presuming that the plaintiff's allegations are correct. *Id.* at 932. In making that direction, the Court of Appeals cited its earlier decision in *Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991)("On a motion under Fed.R.Civ.P. 12(b)(1) challenging the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits"). In the case at bar, the record consists of a copious amount of affidavits, exhibits, and depositions.

Before turning to the evidentiary material generated by discovery, I consider the applicability to the case of the FTAIA and the FSIA. The FTAIA applies to antitrust actions arising out of certain forms of trade or commerce with foreign nations. The FSIA applies to all actions, of any nature, against foreign sovereigns.

*The FTAIA*

■ The FTAIA, 15 U.S.C. § 6a, whose full text appears in the margin,[7] renders the Sherman Act inapplicable to "conduct involving trade or commerce (other than export trade or export commerce) with foreign nations unless ... such conduct has a direct, substantial, and reasonably foreseeable effect" upon certain specified forms of trade or commerce. The FTAIA was enacted "[i]n an effort to provide a single standard to determine whether American antitrust laws apply to a given extraterritorial transaction." *O.N.E. Ship-*

*ping Ltd. v. Flota Mercante Grancolombiana, S.A.,* 830 F.2d 449, 451 (2d Cir.1987), *cert. denied,* 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988). *See also Filetech, S.A.,* 157 F.3d at 931 ("[T]he FTAIA forbids the exercise of jurisdiction over Sherman Act violations relating to foreign trade or commerce, other than import trade or commerce, unless the conduct complained of has a 'direct, substantial, and reasonably foreseeable effect' on domestic or import commerce").

The defendants at bar invoke the FTAIA in moving to dismiss on the ground, *inter alia,* that despite exhaustive discovery, Filetech has failed to demonstrate that defendants' conduct "has a direct, substantial, and reasonably foreseeable effect" on domestic or import commerce. Filetech contends, in response, that since this dispute involves import commerce, the FTAIA itself is not applicable. *See Eskofot A/S v. E.I. DuPont,* 872 F.Supp. 81, 85 (S.D.N.Y.1995) ("The implication that the Sherman Act provisions continue to apply to import trade and import commerce is unmistakable"). In the alternative, Filetech argues that it has demonstrated the FTAIA's requisite direct, substantial and reasonably foreseeable effect of defendants' conduct.

*The FSIA*

■ I must also consider the applicability and effect of the FSIA upon the case at

---

7. "Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless -
    (1) such conduct has a direct, substantial, and reasonably foreseeable effect -
        (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
        (B) on export trade or export commerce with foreign nations, of a person engaged

in such trade or commerce in the United States; and
    (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.
If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States."

bar. Accepting *arguendo* plaintiff's contention that the FTAIA does not preclude the Court's exercise of subject matter jurisdiction in this antitrust case, that jurisdiction also depends upon compliance with the prerequisites of the FSIA, which "provides the sole basis for obtaining jurisdiction over a foreign sovereign in the United States." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (citation and internal quotation marks omitted). The FSIA applies to the instant case because the principal defendant, France Telecom, S.A., is an instrumentality of a foreign sovereign, the Republic of France. Accordingly that defendant's wholly-owned subsidiary, defendant France Telecom, Inc., has the same status. The defendants remain instrumentalities of France, notwithstanding France Telecom's recent transformation from an entity wholly owned and operated by the French government to a publicly traded company in which the government is the majority shareholder. Plaintiff does not contend otherwise; on the contrary, counsel conceded the point at oral argument.[8]

The sensible course for the Court to follow is to determine first whether plaintiff has established jurisdiction under the FSIA. If there is no subject matter jurisdiction under the FSIA, then the FTAIA need not be considered further, since in that circumstance the FTAIA would have no office to perform, either as a bar to jurisdiction, as defendants contend, or as a source of jurisdiction, as plaintiff contends in the alternative.

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the Courts of the United States and of the States except as provided in § 1605 to § 1607 of this chapter." 28 U.S.C. § 1604. The statute then articulates "general exceptions to the jurisdictional immunity of a foreign state," most importantly where the "action is based upon a commercial activity" of the sovereign nation. 28 U.S.C. § 1605(a)(2).[9]

■ To obtain jurisdiction based upon activities outside the United States that cause a direct effect *in* the United States, the effect must be direct in such a way that it is an "'immediate consequence of the defendant's ... activity'." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394, citing *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir.1991).

■ The FSIA imposes on the parties a shifting burdens regime. "Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *Cabiri v. Government of the Republic of Ghana*, 165 F.3d 193, 196 (2d Cir.1999) (citations omitted). As mentioned above, it is undisputed that France Telecom is a for-

---

**8.** "THE COURT: Do you, therefore, acknowledge that in order for subject matter jurisdiction to remain in this case I must be satisfied that one of the exceptions to the FSIA applies?"

MR. SOFFER [counsel for plaintiff]: "Exactly." Transcript of Oral Argument at 33.

**9.** § 1605(a) provides: "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any

case ... (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C.A. § 1605(a)(2).

eign sovereign. Filetech, therefore, must come forward with evidence to sustain its claim that an exception to the FSIA applies.

Filetech relies on the first and third exceptions specified in § 1605(a): commercial activity carried on by France Telecom in the United States; and commercial activity by France Telecom in France which caused a direct effect in the United States. Following extensive discovery on the question of subject matter jurisdiction,[10] the Court finds that Filetech has failed to sustain its intermediate burden to bring forth adequate evidence under either of the exceptions to the FSIA.

### I. Activity in the United States

■■■ To sustain jurisdiction on the basis of commercial activity by a foreign state in the United States, "there must be a significant nexus between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action." *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales,* 235 F.3d 738, 747 (2d Cir.2000) (citation and internal quotation marks omitted). For this exception to sovereign immunity from suit to apply, a plaintiff's "action must be 'based upon' some 'commercial activity' by [a defendant] that had 'substantial contact' with the United States within the meaning of the [FSIA]." *Saudi Arabia v. Nelson,* 507 U.S. 349, 356, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). The phrase "substantial contact" is derived from the FSIA, 28 U.S.C. § 1603(e), which defines "a commercial activity carried on in the United States by a foreign state" as "commercial activity carried on by such state and having substantial contact with the United

States." "The Court of Appeals has read this clause to focus not on whether the defendant generally engages in commercial activity in the United States, but on whether the particular conduct giving rise to the claim is, or is not, an integral part of commercial activity having substantial contact with the United States." *Colonial Bank v. Compagnie Generale,* 645 F.Supp. 1457, 1463 (S.D.N.Y.1986) (Leval, *J.*) (citation omitted). "Congress left it to the courts to define the contours of 'substantial contact' between a foreign state's commercial activity and the United States," but "it is clear that Congress intended a tighter nexus than the 'minimum contacts' standard for due process." *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1019 (2d Cir.1991) (citations omitted).

In the case at bar, Filetech has failed to demonstrate that to the extent France Telecom engaged in commercial activities in the United States, that particular conduct gave rise to Filetech's antitrust claim. Specifically, Filetech claims that by its conduct, France Telecom exercised a monopoly power over a relevant market. The relevant market, as defined by Filetech, consists of "data processing services for the creation of address lists intended to be used by clients for marketing purposes ...". *Filetech S.A.R.L.,* 978 F.Supp. at 470. Thus, it is not enough for Filetech to come forward with evidence that France Telecom has engaged in *some* forms of commercial activity in the United States. It must show that the defendants' activities here relate specifically to "data processing services for the creation of address lists intended to be used by clients for

---

**10.** The following exchange indicates the depth of discovery.

THE COURT: ... you worked your way— with a certain degree of, dare I say, indulgence on my part—throughout the entire hierarchy of France Telecom ...

MR. SOFFER: Your Honor has given me tremendous leeway in the depositions, and I thank you for that, and it's true ...

Transcript of Oral Argument at 53–54.

marketing purposes." *Id.* at 470; *Colonial Bank,* 645 F.Supp. at 1463.[11]

The alleged commercial activities of France Telecom[12] in the United States concern the two services described above, Teladresses and Marketis. Marketis was available previously through Minitel Services Company ("MSC"), a subsidiary of France Telecom. Beginning with Teladresses, France Telecom asserts that since 1993, France Telecom sent just "ten invoices to U.S. customers totaling about $15,000" in U.S. dollars.[13] Transcript of

Oral Argument at 15. Neither in its briefs nor at oral argument did Filetech challenge the validity of these figures.[14] Such sales hardly establish that Teladresses is or was "an integral part of commercial activity having substantial contact with the United States." *Colonial,* 645 F.Supp. at 1463. Despite depositions of numerous high ranking personnel employed by France Telecom, Filetech uncovered no evidence of any design on the part of France Telecom to use Teladresses to market mailing list services in the United States. Perhaps for this reason, Filetech spent

11. At oral argument Filetech asserted that the dispute concerns "not only marketing lists but data services that are imported from France." Transcript of Oral Argument at 33. A colloquy ensued as follows:

THE COURT: "Well, your repeated reference to data services, whatever they may be, prompts me to wonder whether there is an effort in the context of this motion to amend the complaint somewhat. In my first opinion I quoted from paragraph 18 from the Filetech complaint, which is still the accusatory instrument in the case, and I said in Filetech's words its business purpose is 'to create a data-base which would include virtually every resident person, entity or business in France from which innovative marketing services could be created ...'. Now, what precisely does that mean, Mr. Soffer? I have always taken it to mean marketing lists...."

MR. SOFFER: "Yes, Your Honor. First of all the complaint might need some amendment. It has been written five years ago, and it probably needs to be updated with certain information that has been gathered as a result of the discovery process ..."

*Id.* at 33

Filetech has not submitted to the Court an amended complaint, nor requested the Court to delay consideration of this motion to provide it time to file an amended complaint. In these circumstances, the Court confines its consideration to the complaint as filed.

12. According to France Telecom, "France Telecom, Inc., which is located in New York, has no involvement whatsoever in the marketing list business, either in the United States or in France." Defendants' Notice of Motion to

Dismiss, Declaration of Dominique Rimbault, "in charge of marketing of telephone directories ... of France Telecom," Exhibit D at 6. Filetech considers France Telecom, Inc. to be France Telecom's "agent ... in the United States" but does not allege specific activities of France Telecom, Inc. Plaintiffs' Memorandum at 15. Unless otherwise noted, the Court will refer collectively to France Telecom.

13. Among the ten purchases was a purchase by Seacor, Inc., a company owned by a relative of Filetech's founder and chairman Guy Birenbaum. It is unclear whether the purchase was *bona fide* or not, and whether any payment was ever made. Deposition of Guy Birenbaum, March 10, 1999 at 61.

14. Instead of challenging the sales figures, Filetech attempts to diminish their evidentiary value. Filetech advances the theory that France Telecom may have suffered in sales because its business model called for the creation of "volume" rather than sales transactions. As counsel stated at oral argument: "you make your data-base available for people to use, you showcase it, and that's how you attract customers." Transcript of Oral Argument at 38. Because of this difference by design, "they [France Telecom] shouldn't come here and say, well, we have only sold 3(sic) or $4,000 worth of lists." *Id.* at 38. Notwithstanding that contention, the magnitude of France Telecom's sales in the United States is highly relevant to an inquiry into the substantiality *vel non* of France Telecom's commercial activity in this country, which is precisely what the FSIA instructs the Court to determine.

little time discussing Teladresses in its briefs or at oral argument.

The focus of the argument, instead, concerns the activities of MSC, Marketis (now defunct and replaced by the new subsidiary Mediatel), and, to the extent there is a meaningful difference, any other on-line service allowing access to France Telecom's database, including the Internet.

According to France Telecom, Marketis has had an equally uneventful sales history in the United States. France Telecom claims that "various factors made Marketis impractical for use in the United States," including the requirement of a French account number and telephone number. Defendants' Memorandum at 10. Because of this, France Telecom claims that "only a handful" of Marketis sales occurred in the United States, for example, 3 users for a total of 3 minutes in 1997, one use by a subscriber in 1998 for less than one minute, and no uses at all in 1999. Elie Abitbol, Chairman of Minitel Services, Declaration at 6. Filetech does not dispute these figures.[15] Minitel has now ceased operation, though some of its services are available on the Internet. Defendants' Notice of Motion, Deposition of Pierre Carrigue, Exhibit G at 12. While the dearth of activity on the Minitel system generally may have disappointed France Telecom, they contend that "it is no accident" it failed to sell any "meaningful" number of mailing lists in the United States because

"it never sought to do so." Defendants' Memorandum at 10.

With regard to mailing lists, France Telecom is adamant, as were numerous of its officers in depositions conducted by Filetech, that it does not and has not advertised or otherwise "aimed at soliciting American customers" for its mailing list business. Defendants' Memorandum at 10; Defendants' Notice of Motion, Deposition of Jean–Jacques Damlamian, Executive Director of Development, Exhibit R at 21; Defendant's Notice of Motion, Deposition of Pierre Carrigue, (Deputy Manager in charge of advertising and printing telephone directories), Exhibit G at 9.

The question whether France Telecom advertised its mailing list services in the United States is disputed. Filetech points to communications sent "to Americans" by France Telecom advertising the usefulness of Minitel for "compiling mailing lists." Plaintiffs' Memorandum at 7. Such communications are described by Jean–Pierre Casara, the Vice President of Marketing and Operations at Minitel, who explains that Minitel provides access to "over 23,000" services, none of which are designed to allow mass compiling of marketing lists. Defendants' Notice of Motion, Affidavit of Jean–Pierre Casara, Exhibit E at 2. France Telecom concedes that in the past Minitel was marketed through MSC in the United States, though they emphasize that Marketis was only one of thousands of services available through Minitel. Defen-

---

**15.** Filetech points to MSC's general revenues (between $100,000 and $500,000) as proof that MSC's business was not "inconsequential." Plaintiffs' Memorandum at 12. Filetech, however, undermines its point when it concedes that "not all of these profits were derived from compiling mailing lists." *Id.* at 13. The larger point Filetech wishes to make is that revenue is not the *sine qua non* of effecting U.S. commerce, and that increased use of their various services by customers suffices to establish the requisite impact in the

United States. Mere evidence of increased use of MSC's thousands of services by persons of unknown origin *does not* establish the requisite impact. Filetech argues "[i]rrespective of how many lists were downloaded or directly sold in the United States over the last ten years, they made a very substantial effort to get U.S. clients and to affect United States commerce in this field." Plaintiffs' Memorandum at 15. Without proof of an effort *or* an effect, Filetech's showing is insufficient.

dants' Memorandum at 11. The communications referred to, says Casara, were designed either to increase the usage of Minitel's services by French speaking persons living in the United States, or by business users of Minitel who might wish to expand into France. The phrase "mailing lists," according to Casara, refers to small lists of businesses which American companies may utilize but which will not, largely, come from Marketis at all, being derived instead from other data, such as Dun & Bradstreet's European database which is found on Marketis. *Id.* at 5. Marketis is not being advertised in these communications, Casara avers, because compilation of marketing list data is a prohibitive task in terms of time and money; it would take "over 16,000 hours, or nearly two years" to use Marketis for the purpose of downloading the French telephone directory, at an exorbitant cost. *Id.* at 5–6.

This explanation, coupled with Filetech's inability to present more evidence that Marketis' commercial mailing list potential was in fact the target of such advertising, leads the Court to conclude on this record that France Telecom has not advertised its mailing list business in the United States, but instead advertises access to other database information not relevant to the present inquiry.[16] Even the Minitel services France Telecom hoped to market and sell successfully in the United States, including the infrastructure technology itself and the other information available through the thousands of services, proved

to be such a failure that "France Telecom determined to shut down MSC's U.S. operations." Defendants' Memorandum at 13. The record supports that contention.

The ability of Americans to access France Telecom's database originally through MSC, and now through the Internet, is also a matter of some dispute. France Telecom insists that this directory was never intended and is not intended "to be used to compile mailing lists," and points to the fact that the Orange List names are included in the directory, without being identified as such, so that the directory cannot be used to facilitate commercial solicitations. Defendants' Memorandum at 13. Instead, France Telecom contends the directory is used for its intended primary purpose of looking up the phone number of a person residing in France and known to the user. Guillet Deposition at 34. In support of that contention, France Telecom adduced evidence that in 1995 MSC subscribers in the U.S. accessed all of the directories 6,828 times, with an average duration of 4 minutes per session. These statistics fell in subsequent years to 1999's average of 769 sessions for an average of 2.5 minutes. Abitbol Declaration at ¶ 9. This, France Telecom asserts, shows that users are canvassing the directory for its intended purpose, that is, to locate phone numbers just as they can through use of the printed version of the directory.

Filetech points to the fact that *it* was able to access the directory and download

16. In its brief, Filetech cites the above reference to "mailing lists" made by France Telecom in correspondence with potential American customers. After this citation in its Memorandum of Law, however, Filetech challenges France Telecom's explanation of such language by responding "France Telecom ... attempts to rationalize the meaning of this statement. However, it plainly shows that France Telecom has been importing data

into the United States and marketing mailing lists, as well as data services." Plaintiffs' Memorandum at 7. Filetech concludes what it does not demonstrate. The language of France Telecom's correspondence itself, however, does not plainly show the intent for which Filetech contends, and the context within which France Telecom places the statement is not adequately challenged by Filetech.

mailing lists from it as proof that the directory allows for creation of marketing lists.[17] France Telecom claims that while "[i]t may be technologically possible to copy names from the electronic directory with special computer software, and thereby create some sort of mailing list," Filetech's "illegal[ ]" access to the directory does not itself show "impact on the U.S. mailing list business." Defendants' Memorandum at 13. There is no evidence before the Court showing any effect on the mailing list business in the United States by virtue of having the French telephone directory available on the Internet. Even assuming that high speed Internet technology allows for more expeditious downloading of data ("[i]t is common knowledge in this day and age [that] a user can download megabytes per minute over the Internet")(Plaintiff's Memorandum at 16), that possibility does not establish that France Telecom intended such downloading to occur in the United States, or that in fact it occurred.

In summary, Filetech has failed to meet its intermediate burden of showing that its antitrust claim is based upon commercial activity of France Telecom having substantial contact with the United States.

## II. Activities Outside the United States

■ Under the third clause of § 1605(a)(2), the Court must consider "whether this lawsuit is (1) based upon an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of [a foreign state] outside this country; (3) that caused a direct effect in the United States." *Republic of Argentina*, 504 U.S. at 611, 112 S.Ct. 2160 (citations omitted). An "effect" in the United States "is direct if it follows as an immediate consequence of the defendant's activity'." *Republic of Argentina*, 504 U.S. at 618, 112 S.Ct. 2160 (citation and internal quotation marks omitted). The "'generally applicable principle *de minimis non curat lex* ensures that jurisdiction may not be predicated on purely trivial effects in the United States.'" *Filetech S.A.*, 157 F.3d at 931, *citing Republic of Argentina*, 504 U.S. at 618, 112 S.Ct. 2160.

It remains "readily apparent" even for purposes of FSIA analysis that "the fundamental commercial importance of France Telecom's activities arises out of its conduct in France, as opposed to any conduct in the United States." *Filetech S.A.R.L.*, 978 F.Supp. at 482. I previously noted

---

**17.** Relying largely on its expert, Mr. Rambom, Filetech claims that France Telecom's "on-line site is accessed frequently, producing both advertising revenues and a window for France Telecom's data services. It creates value for their Internet business." Plaintiffs' Memorandum at 10, citing Rambom Affidavit at 6. Rambom believes it "highly unlikely" that France Telecom would sustain an "English-language" website and maintain the "infrastructure" to allow for sales of marketing lists to U.S. businesses, if its mailing list business were minimal. What Rambom's report fails to make explicit is that many non-"commercial mailing list" services could also explain such infrastructure and English language (the language of the global marketplace). Though both Filetech experts, Rambom and De Podwin, argue that a "potential market" exists for mailing list services aimed ultimately at French customers, they do not show that France Telecom has more than *de minimis* involvement in such a market. Filetech exaggerates the effect of France Telecom's "concession," made by its expert witness, that "it is not difficult to see why such a customized list of target customers might be appealing to a U.S. company wishing to target potential customers in France." Affidavit of Steven Schwartz at 4; Plaintiffs' Memorandum at 3. As discussed *infra*, France Telecom need not challenge the *idea* that the sale of marketing lists to U.S. businesses is a potentially lucrative market, but may instead show that they have not, to any meaningful degree, entered it.

that Filetech's "38 page, 80 paragraph complaint describes at length its aspirations and France Telecom's conduct, but the allegations concerning the effect of that conduct upon American commerce are scant." *Filetech S.A.R.L.*, 978 F.Supp. at 482. After substantial discovery Filetech has fared no better in its proof.

Few courts have examined the "direct effect" provision of the FSIA in an antitrust context. Filetech contends that the actions taken by France Telecom had at least as direct an effect on U.S. commerce as the activities in a line of contract cases, the most prominent of which is *Republic of Argentina*. I do not agree. In those cases where a sufficiently direct effect was found to trigger the commercial activities exception, a greater showing was made by the plaintiffs than is made here.

Two decades ago, the Second Circuit considered the question what is a "direct effect in the United States" in *Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir.1981). The Nigerian government entered into a number of contracts in the mid–1970's to purchase cement from some 68 suppliers. Some of these contracts were with American companies. Not long after, Nigeria reneged on many of the contracts, prohibiting unloading of the cement at Nigerian ports and unilaterally altering letters of credit. The Court of Appeals found a direct effect in the United States based on two principal facts. First, the contracts provided that "cement suppliers were to present documents and collect money in the United States"; second, "each of the plaintiffs [was] an American corporation." *Id.* at 312. Though "neither 'direct effect' nor 'in the United States' is a term susceptible of easy definition," *id.*, the Court had "no doubt that Congress intended to bring suits like these into American courts." *Id.* at 313.

In two other cases antedating the Supreme Court decision in *Republic of Argentina*, *Int'l Housing Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8 (2d Cir.1989) and *Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir.1991), the Second Circuit considered the FSIA's "direct effect" test. In *Int'l Housing* the plaintiffs, organized in the Cayman Islands, sought to enforce a default judgment entered against the defendant, a banking corporation owned by Iraq, in the Commonwealth of the Bahamas. The parties signed a contract providing that the plaintiff was to construct 740 housing units in Iraq for a price of around $5 million. Unlike the facts in *Texas Trading*, however, the parties did not direct their relationship in any tangible way toward the United States. The United States was not provided for as the location for payment or further dealings. *Id.* at 11. In these circumstances, the Second Circuit refused to find subject matter jurisdiction under the FSIA. By comparison, *Shapiro* involved the issuance of promissory notes by the defendant, the Republic of Bolivia, to an American corporation, activity which eventually "introduced negotiable promissory notes into the United States for the purpose of raising capital." 930 F.2d at 1019. The Court of Appeals concluded that this activity fit within the commercial activities exception to the FSIA, holding "we know of no theory that would cause us to read the FSIA to allow a foreign state to issue bearer notes to an intermediary in the United States and then to deny that it was engaged in commercial activity as defined in the FSIA." *Id.*

The Supreme Court's decision in *Republic of Argentina* tracks the Second Circuit's rationale in these earlier cases. As in *Shapiro*, the defendant government of Argentina issued bonds providing for payment in U.S. dollars, designating accounts in New York as the place of payment.

This made New York the place of performance, and thereby subjected the defendant to U.S. court jurisdiction. The rescheduling of debt by Argentina had a direct effect in the United States, as "money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." 504 U.S. at 619, 112 S.Ct. 2160. *See also Hanil Bank v. Pt. Bank Negara Indonesia,* 148 F.3d 127 (2d Cir.1998) and *Wasserstein Perella,* No. 97 Civ. 793, 2000 WL 573231 (S.D.N.Y., May 11, 2000), which on facts comparable to *Republic of Argentina,* found that a "direct effect" had been established.

Filetech contends that "surely the direct effect" in the case at bar "is as direct as the failure of a foreign bank" to pay into a New York bank account, as in the case in *Republic of Argentina.* Plaintiffs' Memorandum at 27. I do not agree. In *Republic of Argentina* and its progeny, the ultimate objective of the contract—the contract's *raison d'etre*—was the payment of funds in the United States. *See Hanil Bank,* 148 F.3d at 132 ("Hanil Bank was entitled under the letter of credit to indicate how it would be reimbursed, and it designated payment to its bank account in New York"). In the case at bar, there is no evidence that France Telecom's activities in France intended or contemplated a specific effect in the United States.

France Telecom's conduct abroad alleged to have a direct effect in the United States also involves the Orange List previously described. Filetech carries an intermediate burden of showing how France Telecom's behavior with respect to the Orange List has caused a "direct effect" in the United States. Examining the totality of evidence before the Court, I conclude that Filetech has failed to make such a showing.

The parties appear to agree that neither Filetech nor France Telecom has had substantial sales of marketing lists in the United States.[18] Transcript of Oral Argument at 55; Birenbaum Deposition at 15. Filetech alleges that its failure to make more substantial sales in the United States is a direct effect of France Telecom's behavior in France. Birenbaum Deposition at 28. In addition to the facts already discussed, two things make this argument insufficient to reach the "immediate consequence" standard under the FSIA, as articulated in *Republic of Argentina.* First, Filetech was able to sell to an American customer, Numa, Inc., a significant amount of marketing list data. Birenbaum Deposition at 17. Sales to that company ranged from approximately $300,000 to $800,000, though it is unclear for exactly how long or how much per year. *Id.* at 16–18. Other than general references to the Orange List's punitive provisions, Filetech has not shown with even a modicum of detail any instances where American companies were deterred by the Orange List from publishing marketing data from Filetech.[19] Instead, Filetech suspended U.S. operations when litigation here and abroad intensified in the mid-to-late 1990's, thus precluding the opportunity to fully test the thesis that American companies would not purchase

**18.** Filetech's sales to Numa, Inc., discussed below, were arguably substantial but were Filetech's sole American clients and have since ceased purchasing from the plaintiff, as it appears they are no longer in business. Filetech does not argue that the sales to Numa constitute substantial U.S. sales.

**19.** Plaintiff would argue that the reason for their failure is that defendants' actions stopped them from further solicitation of U.S. customers. However, without attempts at sales and subsequent expressions of apprehension by such companies, the Court cannot see how plaintiffs divined that the Orange List frightened other U.S. companies away. In any event, plaintiffs have not proved this occurred.

data from them for fear of Orange List violations. Birenbaum at 14–15 (admitting such suspension of business). There is simply. no evidence presented, despite years of litigation, that U.S. companies are concerned at all about the Orange List. Under such circumstances the Court must conclude that any effect on U.S. commerce from the Orange List was and is indirect at best.

There is a second reason why Filetech's claim of "direct effect" fails. While Filetech has had a purged directory since the summer of 1999, it has failed to arrange for or complete a single U.S. sale of either French database information or any other database information, including some which does not contain Orange List dangers. Defendants' Memorandum at 19–20. At the same time, Filetech's business in France, the focus of the Orange List's punitive effects, has done quite well. Affidavit of Schwartz at ¶ 27. It is also worth mentioning that Filetech has not seriously contended that it cannot compile data from the purged lists open for purchase in France from France Telecom, only that such data is prohibitively costly and would require regular updates.

In sum, Filetech has failed to show that France Telecom's activities abroad caused a direct effect in the United States.

■■■ Assuming without deciding that France Telecom's conduct caused Filetech economic loss, even substantial loss, "the size of the loss is not determinative of the United States Courts' jurisdiction, which turns rather on whether the injury was 'direct.'" *Colonial Bank*, 645 F.Supp. at 1465. In *Colonial Bank*, District Judge Leval (as he then was) went on to offer an analysis well worth quoting:

> [T]he direct/indirect distinction serves a meaningful end in relation to the statute's objectives in foreign relations. The statute seeks a balance between the provision of a convenient forum for claimants aggrieved in commercial dealings with foreign states and the promotion of comity and harmony between the United States and other nations. *House Report* U.S.Code Cong. & Admin.News 1976, at 6616. To extend jurisdiction to claims brought by all persons indirectly injured by commercial acts of foreign states would subject them to the jurisdiction of United States courts in an enormously expanded number of cases (including, no doubt, many that would eventually be dismissed for failure to state a cause of action).

*Id.*

Given the state of the record in the case at bar, subjecting France Telecom to the jurisdiction of a United States court on Filetech's claims would disregard the balance crafted by Congress in the FSIA.

### CONCLUSION

For these reasons, the Court concludes that plaintiff has failed to establish subject matter jurisdiction over the defendants in accordance with the requirements of the FSIA. The defendants, being instrumentalities of a foreign sovereign nation, are accordingly immune from suit in this Court on the claims alleged in the complaint. The foregoing Discussion comprises the Court's Findings of Fact and Conclusions of Law.

That conclusion requires dismissal of the complaint. It is not necessary for the Court to decide whether dismissal is also required by the FTAIA or the Sherman Act itself. But it may not be amiss to observe that subject matter jurisdiction under those statutes appears equally problematical.

As noted, subject matter jurisdiction under the FTAIA's exceptions to the Sherman Act may be found with respect to conduct involving foreign trade or commerce only if "such conduct has a direct,

substantial, and reasonably foreseeable effect" on domestic or import commerce. 15 U.S.C. § 6a(1). As for the Sherman Act, the Supreme Court in *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), citing cases decided before enactment of the FTAIA, observed: "[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." The *Hartford* Court added in a footnote that it was "unclear ... whether the [FTAIA]'s 'direct, substantial and reasonably foreseeable effect' standard amends existing law or merely codifies it," but did not need to address the question because "[a]ssuming that the FTAIA's standard affects this litigation, and assuming further that the standard differs from the prior law, the conduct alleged plainly meets its requirements." *Id.* at 797 n. 23, 113 S.Ct. 2891. The complaint in *Hartford* alleged that the defendant "London reinsurers engaged in unlawful conspiracies to affect the market for reinsurance in the United States and that their conduct in fact produced substantial effect," *id.* at 796, 113 S.Ct. 2891, allegations the Court held were sufficient to satisfy the jurisdictional requirements of either statute. The case at bar would seem to present the converse proposition: Filetech's proof is insufficient to satisfy either statute.

The Clerk of the Court is directed to dismiss the complaint for lack of subject matter jurisdiction.

It is SO ORDERED.